PAULINE CLEMENTS AND ANOTHER v. SWEDISH
HOSPITAL AND ANOTHER.

89 N. W. (2d) 162.

March 14, 1958—No. 37,065.

*Lawrence O. Larson,* for appellants.

*Meagher, Geer, Markham & Anderson* and *O. C. Adamson II,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action by Pauline Clements to recover for personal injuries alleged to have been due to the negligence of defendant, The Swedish Hospital; and by Robert Clements, her husband, for special damages in connection therewith. Originally, Dr. A. Cabot Wohlrabe was named as a codefendant, but subsequently plaintiffs dismissed the action as to him. At the close of the testimony, the trial court directed a verdict in favor of The Swedish Hospital. This is an appeal from the judgment subsequently entered pursuant thereto.

The facts are as follows: On March 27, 1954, Mrs. Clements sustained injuries in an automobile accident for which she was given care and treatment at Minneapolis General Hospital on March 27 and 28, 1954. After first returning to her home from General Hospital, she was hospitalized in The Swedish Hospital on March 29, 1954, at the direction of her physician, Dr. Wohlrabe, for the purpose of receiving care and treatment for her injuries resulting from the automobile accident. No mention was made of any mental disturbance or distress afflicting her.

During the evening of March 29, 1954, she was examined by Dr. Wohlrabe and by his order she was given bathroom privileges. No special care was prescribed for her. During the following day (March 30,

1954), she appeared nervous and apprehensive over her condition. At 8 p.m., while the nurse was with her, she removed a scissors from the nurse's pocket and said that she "didn't want to die." The nurse quieted her and persuaded her to go to bed and recorded the incident in her notes on the patient. At 8:30 p. m. she was visited by Dr. Wohlrabe, at which time the nurse's records were available for him. He noted in his progress notes for that visit that Mrs. Clements exhibited depression and possible hallucinatory ideas. He did not order any special treatments for plaintiff at that time and his order that she have bathroom privileges remained in effect.

Mr. Clements testified that, after talking with his wife that day, he told the nurse in attendance that his wife was talking about things that had happened years back; that she had made the statement that he and their little boy were talking about her (Mrs. Clements) over the radio; that he then asked the nurse "When will the doctor be in?" and that as he left her she said to him "We will have to watch Mrs. Clements very close," and that he then stated "I am worried about it, she is not right"; and that after that he had talked to Dr. Wohlrabe.

For the days following, the notes made by the nurse assigned to Mrs. Clements included the following:

"March 30, 1954 (Tuesday) 11:45 (P. M.). Refused to have blood pressure taken. States she wants to be left alone so she can get some sleep. Also stated she didn't want to die.

"(March 31, 1954, Wednesday).

"1:00 (A. M.) Resting quietly.

"3:00 (A. M.) Sleeping.

"8:00 (A. M.) Appears less apprehensive this a.m. Anxious to go home as she states she feels well now. Cheerful and cooperative — (D. Mayer). Dr. Wohlrabe visited — Pt. conversed with relative this a.m. approximately 8.00 A. M. — seemed very happy that relative visited with her. Very cooperative when Dr. Wohlrabe removed sutures near rt. ear."

Miss Ada Clements, an aunt of Mr. Clements, visited Mrs. Clements Wednesday morning, March 31, 1954. She had known her for some time and testified that on this visit Mrs. Clements appeared "normal,"

just as she had always been when she had lived with the witness.

Dr. Wohlrabe, who saw her on the same morning, at that time made this notation in his progress reports:

"31 Mar. Remainder of sutures removed from face laceration. Pt. very apprehensive however is able to control herself rationally. Neurological negative — up and around today. Cheerful about going home tomorrow.  A. C. W."

After this visit he left instructions that Mrs. Clements should be permitted to be up and around. Thereafter, entries of the nurse's notes indicate the following:

"12 Methodist minister visited — patient seemed to enjoy talking with him — appeared reluctant to have him leave. Other pt. states she refused to eat any of her dinner.

"12:50 On entering the room in respond (sic) to light. Only had a glimpse of patient passing over the window sill. This was reported to the head nurse. A few minutes later I found Mrs. Clements where she had landed on grate. Covered with a coat. Taken to the emergency room.  F. Marshall."

It is from injuries resulting from this incident that the present action was instituted.

At the trial plaintiffs called Dr. Robert Stoltz, a specialist in psychiatry and neurology. His testimony, based upon the hospital record which was read to him, was to the effect that it would be impossible for any nurse to recognize suicidal tendencies on the part of Mrs. Clements; and that even as a psychiatrist he might not have noticed such tendencies. Dr. Samuel G. Balkin, testifying for plaintiffs, stated that he had observed Mrs. Clements while she was in the hospital and had not noticed any unusual behavior on her part.

The Swedish Hospital is a general hospital and has no ward or department nor any special equipment for the care of psychiatric or mental patients and does not accept such patients. On its staff it has several neurosurgeons and psychiatrists including Dr. Stoltz above referred to. It is the place where its staff doctors bring their patients for care, and the doctors, not the hospital, direct the care to be given such

patients. The psychiatrists on its staff come in as consultants to other doctors but do not hospitalize their psychiatric patients there. In cases where patients have become mentally disturbed so as to require psychiatric attention after being admitted to the hospital, the hospital does not assume responsibility for treatment of such patients, except to carry out the orders of their doctors.

, The hospital is not equipped with portable window bars or cages for the restraint of mental patients. There are no locks on the windows. If a patient manifests suicidal tendencies, a report to such effect would be made to the patient's doctor, and the hospital employees would carry out his instructions in the case.

The evidence disclosed that hospitals organized for the care of mental patients are specially equipped and staffed for such purpose. If a patient at The Swedish Hospital manifested mental disorder, the patient's doctor would be immediately advised to such effect and the hospital would arrange for a transfer of such patient to some mental hospital. There was testimony to the effect that The Swedish Hospital and its personnel rely upon the attending doctor's judgment as to treatment of a patient and that The Swedish Hospital nurses could not treat a patient contrary to the instructions of the patient's doctor. Under no circumstances would they attempt to restrain, tie up, or imprison any patient without an order to do so from the patient's doctor, except in cases of extreme emergency, since to do so might set off psychiatric disorders or mental unbalances.

■ The case appears governed by the decision of this court in Mesedahl v. St. Luke's Hospital Assn. 194 Minn. 198, 259 N. W. 819. There, plaintiff had entered the hospital because of a nervous and distressed condition, of which his attending physician and the hospital were aware. On the third day after he was admitted the record indicated that his talk became irrational and that he had a wild glare in his eyes. An interne who had examined him reported that he appeared much depressed and suffering under the belief that he had done something wrong. No restraints were placed upon him, nor were there instructions that someone remain with him. During the afternoon of the third day, he broke the glass in the upper half of the window of his third-floor

room and jumped therefrom. The defendant hospital there, as here, was a general hospital for the care of medical, surgical, and like cases. There, as here, it was not equipped to handle mental patients, and as here its attendants performed routine services in carrying out the orders of attending physicians. In determining that the hospital in the case cited was not chargeable with negligence for failing to anticipate that plaintiff was contemplating suicide, even though the hospital attendants had recorded his peculiar appearance and behavior, this court stated (194 Minn. 204, 259 N. W. 822):

"As to plaintiff's condition, the attending physicians knew as much as, or more than, did the hospital authorities. They gave no instructions to apply restraints, nor did they direct that the bars be put on the window. The nurses and internes at a general hospital are charged with the duty of carrying out the instructions of the attending physician, except in cases of emergency. Such of necessity must be the rule. When a patient enters a hospital upon the advice of a physician chosen by him, he naturally desires and expects, and has the right to expect, that the instructions of his physician will be complied with. He relies upon the skill of his own doctor; he knows nothing of the ability of the internes and nurses. Where an emergency arises it is of course incumbent upon the nurses or internes to exercise their own judgment until report can be made to and instructions received from the attending physician. Such, the evidence shows, was the practice at defendant's hospital. There is nothing in the evidence indicating an emergency. * * * The associates of the attending physician visited plaintiff after the notation had been made upon the chart relative to the wild glare in plaintiff's eyes, his restlessness, etc. The evidence shows that charts of this kind are kept for the information of the doctors, and presumably they read what had been entered thereon."

■ In the instant case the evidence in favor of defendant hospital is far stronger than in the Mesedahl case. Here, there was nothing to indicate that plaintiff was contemplating suicide. True, she acted in a peculiar manner and talked irrationally at first, but the nurse's reports, as well as the doctor's progress reports, indicate that by March 30, 1954, she was less apprehensive, was more cheerful and cooperative,

and seemed very happy. On March 31, while still apprehensive, she appeared able to control herself rationally and was cheerful about the prospect of returning home that day. She enjoyed talking to the minister who visited her that day and was reluctant to have him leave. She also manifested pleasure at the visit of her relative. To hold that under such circumstances the failure of the hospital attendants to apply restraints or to take other steps to restrict or confine her upon their own responsibility constituted negligence would place too heavy and dangerous a burden upon the attendants employed by a general hospital. Hospitals for the treatment of mental patients are specially equipped and are staffed with employees trained in the field of mental disorders. If such a hospital were involved here, it might well be determined that the failure of its employees to restrain a patient confined for mental disorders or developing mental disturbances and manifesting suicidal tendencies after confinement constituted negligence. See, Mounds Park Hospital v. Von Eye (8 Cir.) 245 F. (2d) 756. But where, as in the instant case, a patient is admitted to a general hospital merely for the treatment of injuries sustained in an accident and nothing is said as to any mental disorders afflicting such patients; and where, after an incident such as described here, the patient manifested such improvement as to eliminate any evidence of peculiarity or tendency to suicide and the hospital attendants abide by the orders of the patient's physician, it can scarcely be said that a fact question is present as to the hospital's negligence. See, Mesedahl v. St. Luke's Hospital Assn. 194 Minn. 198, 259 N. W. 819.

Judgment appealed from is affirmed.

Affirmed.