Jackie L. DONALDSON, Court Appointed Trustee for the Heirs of Lynette Robarge, Respondent,

v.

YOUNG WOMEN'S CHRISTIAN ASSOCIATION OF DULUTH, Petitioner, Appellant.

No. C6–94–1115.

Supreme Court of Minnesota.

Nov. 17, 1995.

Jon K. Iverson, Paul D. Reuvers, Minneapolis, for appellant.

Laurence J. Klun, Ely, for respondent.

## OPINION

PAGE, Justice.

This appeal arises out of a wrongful death action brought by Jackie L. Donaldson as Trustee for the Heirs of Lynette Robarge (Trustee) against the Young Women's Christian Association of Duluth (YWCA) as a result of the March 23, 1991, suicide of Lynette Robarge. The complaint alleges that the YWCA negligently failed to respond when several residents reported that Robarge was in distress in her room and needed assistance. The YWCA moved for summary judgment, arguing that it had no duty to protect Robarge from committing suicide.

The district court in granting the YWCA's motion found that no special relationship existed between the YWCA and Robarge which imposed a duty on the YWCA to protect Robarge from committing suicide. The Trustee appealed, and the court of appeals, in a divided opinion, reversed. The court of appeals, finding that a special relationship existed between the YWCA and Robarge and that Robarge's suicide was reasonably foreseeable, held that the YWCA had a duty to protect Robarge. In dissent, Judge Lansing argued, based on the facts of this case, that public policy did not favor extending a legal duty to protect someone from committing suicide. Because we conclude that there was no special relationship between the YWCA and Robarge, and therefore no duty on the part of the YWCA to protect Robarge from committing suicide, we reverse the court of appeals and reinstate summary judgment in favor of the YWCA.

The YWCA owns and operates a 97–room housing facility in Duluth, Minnesota. The facility primarily serves low-income individuals, including many with mental health problems. At the time of Robarge's death, Center City Housing Corporation, Inc. managed the facility as a permanent housing facility with weekly and monthly rentals. The facility operates pursuant to a lodging license and is classified as a "lodging house" under Minnesota law. *See* Minn.Stat. § 157.01, subd. 1 (1990) (defining a "lodging house" as a place "where sleeping accommodations are furnished to the public as regular roomers, for periods of one week or more, and having five or more beds to let to the public").

The YWCA staffed the front desk at the facility 24 hours a day. The front desk staff provided a number of services for residents, including, but not limited to, mail distribution, paging residents for incoming phone calls,[1] and during nighttime hours, making

---

1. The front desk staff handled incoming phone calls for residents who did not have private phones in their rooms. Each floor had a phone in the hall for the residents' use. If a phone call came in to the switchboard for a resident, the front desk staff would call up to the resident's floor, and the call would be announced on the speaker of the phone on that floor. The front

hourly patrols of the halls. It was the YWCA's policy that residents were to contact the front desk if they had complaints or concerns regarding activities in the building. It was also the YWCA's policy that when a front desk employee received a complaint involving a major disturbance or a security, health, or safety emergency, the employee was to call 911 and get the police involved. In non-emergency situations, the front desk employee had discretion as to how to proceed, often only making a note of the complaint or concern in the front desk log book.

Robarge suffered from a borderline personality disorder and was being treated by a psychiatrist by the name of Dr. Gary A. Cowan. Dr. Cowan did not consider Robarge to be a significant suicide risk. Although Robarge had made what Dr. Cowan called "suicide displays" in the past, she never made a serious suicide attempt of which he was aware. Dr. Cowan noted that Robarge always made certain that somebody was around to give her attention when she engaged in these suicide displays. An example of one of Robarge's suicide displays occurred on February 6, 1991, when, while receiving in-patient treatment at St. Luke's Hospital in Duluth, she became upset at having to leave the hospital. As a result, Robarge made superficial cuts on her wrists and then showed them to a nurse.

On February 26, 1991, Robarge signed a housing agreement with the YWCA to rent room 317 on a monthly basis and moved in shortly thereafter. On the night of March 22, 1991, Sharon Knutson, a YWCA resident who lived next door to Robarge, heard, over a period of several hours, moaning and crying coming from Robarge's room, but did not contact anyone about the moaning and crying. Knutson also heard moaning coming from Robarge's room the next morning. Later that morning, Knutson told Diane

Anderson, another third-floor resident, about the moaning and crying she had heard coming from Robarge's room. Unsure of what to do, Knutson and Anderson reported the moaning and crying to Elliott Ricehill,[2] a YWCA resident and front desk employee who was working the front desk at the time, and asked him to check on Robarge. Ricehill did not check on Robarge. At about noon, the front desk paged Robarge for a phone call. Knutson and Anderson, hearing the page, knocked on Robarge's door, but there was no response. The door was closed, and they did not try to open it. Knutson and Anderson then left the YWCA to have lunch and go shopping. Knutson and Anderson returned to the YWCA late that afternoon and at some point went to Ricehill's room and asked if he had checked on Robarge. He indicated that he had not checked on her, but said he would call and ask Angie Derousseau, Robarge's close friend and distant cousin, to check on her.

Shortly before 7:30 p.m. that evening, Derousseau arrived at Robarge's room at the YWCA. Derousseau knocked on Robarge's door, but did not get a response. Derousseau tried the door, which was unlocked, entered the room, and found Robarge dead on the floor. A suicide note dated March 21, 1991, was found in the room. According to the autopsy report, the cause of death was a "self-inflicted drug overdose."[3] The coroner was unable to pinpoint the time death occurred or when the lethal overdose was taken.

When reviewing summary judgment, we must determine "whether there are any genuine issues of material fact and whether the trial court erred in its application of the law." *Wartnick v. Moss & Barnett*, 490 N.W.2d 108, 112 (Minn.1992). In making that determination, we view the evi-

desk staff would wait for somebody to answer, and that person would then knock on the door of the resident who received the phone call. The resident would either take the phone call, or the front desk staff would take a message for the resident.

2. During the time that Robarge was living at the YWCA, she became involved in a sexual relationship with Ricehill. That relationship ended on

either March 20 or 21, 1991, when Ricehill broke off the relationship.

3. The toxicology studies detected a post mortem blood concentration of 4370 nanograms per milliliter of Nortriptyline, a tricyclic antidepressant sold commercially as Pamelor. Nortriptyline levels greater than 2500 nanograms per milliliter suggest a significant overdose.

dence in the light most favorable to the party against whom the motion for summary judgment was granted. *Offerdahl v. University of Minn.*, 426 N.W.2d 425, 427 (Minn.1988).

■ A person generally has no duty to act for the protection of another person, even if he realizes or should realize that action on his part is necessary. *Delgado v. Lohmar*, 289 N.W.2d 479, 483 (Minn.1979) (citing Restatement (Second) of Torts § 314 (1965)). The existence of a legal duty depends on the relationship of the parties and the foreseeability of the risk involved. *Erickson v. Curtis Inv. Co.*, 447 N.W.2d 165, 168–69 (Minn. 1989). The existence of a legal duty to protect another person generally presents an issue for the court to decide as a matter of law. *Larson v. Larson*, 373 N.W.2d 287, 289 (Minn.1985).

■ A legal duty to act for the protection of another person arises when a special relationship exists between the parties. *Erickson*, 447 N.W.2d at 169; *see also* Restatement (Second) of Torts § 314A (1965). Usually, a special relationship giving rise to a duty to protect is found only on the part of common carriers, innkeepers, possessors of land who hold it open to the public, and persons who have custody of another person under circumstances in which that other person is deprived of normal opportunities of self-protection. *Harper · v. Herman*, 499 N.W.2d 472, 474 (Minn.1993); Restatement (Second) of Torts § 314A. Typically, the plaintiff is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56, at 374 (5th ed. 1984). To reach the conclusion that a special relationship exists, it must be assumed that the harm to be prevented by the defendant is one that the defendant is in a position to protect against and should be expected to protect against. *Erickson*, 447 N.W.2d at 168.

■ The Trustee maintains that because the YWCA ran its housing facility like a hotel, staffing a front desk 24 hours a day, instructing residents to call the front desk when they had concerns, restricting visitors, and taking telephone messages, a special relationship analogous to an innkeeper-guest relationship existed between the YWCA and Robarge. We do not agree. These attributes do not change the YWCA's relationship with its lodgers to that of an innkeeper-guest relationship. However, even if we were to assume that they did create such a relationship, it would not necessarily establish a duty on the part of the YWCA to prevent suicides by its residents. Although Robarge may have been dependent on the YWCA for protection against harm caused by third parties, it does not necessarily follow that she was dependent on the YWCA for protection from herself.

We have never had occasion to decide whether innkeepers or lodging house operators have a duty to protect guests or lodgers from self-inflicted harm. Our prior decisions have involved the duty of an innkeeper to protect guests against harm caused by third parties or outside forces. For example, we have held that operators of a hotel which owned an adjoining parking ramp had a duty to use reasonable care to deter criminal activity in the parking ramp. *Erickson*, 447 N.W.2d at 170–71; *see also Connolly v. Nicollet Hotel*, 254 Minn. 373, 380, 95 N.W.2d 657, 663 (1959) (concluding that an innkeeper owes a duty to protect persons against foreseeable risk of danger attendant upon the maintenance and operation of its property).

■ Courts have traditionally shown reluctance to impose liability on others for self-inflicted harm. Note, *Custodial Suicide Cases: An Analytical Approach to Determine Liability for Wrongful Death*, 62 B.U.L.Rev. 177, 199 (1982); *see, e.g., Snyder v. Baumecker*, 708 F.Supp. 1451, 1463 (D.N.J.1989) (observing that because of its intentional and deliberate nature, courts have generally recognized suicide as an intervening act which is not foreseeable). Certain special relationships, however, do create a legal duty to protect another from self-inflicted harm. That duty has most often been found where an institution such as a hospital or jail has physical custody and control of the person to be protected. *Clements v. Swedish Hosp.*, 252 Minn. 1, 89 N.W.2d 162 (1958); *Mesedahl v. St. Luke's Hospital Ass'n*, 194

Minn. 198, 200, 259 N.W. 819, 820 (1935); *see also Matje v. Leis,* 571 F.Supp. 918 (S.D.Ohio 1983); *Murdock v. City of Keene,* 137 N.H. 70, 623 A.2d 755 (1993).

In *Mesedahl* we held that a hospital[4] has a duty to use reasonable care to prevent a patient's suicide if a reasonably prudent person under the circumstances should have anticipated a suicide attempt. *Mesedahl,* 194 Minn. at 200, 259 N.W. at 820. In doing so, we noted that the duty will be imposed where the hospital's personnel have special training and experience in recognizing suicidal tendencies and where they have special knowledge of the decedent's suicidal tendencies. While we acknowledged that a hospital may have a duty to prevent suicides, we refused to impose liability on the hospital in *Mesedahl* because the defendant was a general hospital unequipped to treat mental illness and had no responsibility to ascertain the patient's history indicating "a proneness to suicide," the patient had no expectation of constant monitoring, and there were no overt acts to warn the hospital that the patient was contemplating suicide. *Id.* at 204–08, 259 N.W. at 822–23. In *Clements,* we again refused to hold a hospital liable for the suicide attempt of a patient, noting that the patient was admitted to a general hospital merely for the treatment of injuries sustained in an automobile accident, the hospital did not assume responsibility for treatment of the patient's mental disturbances, and the patient's physician did not prescribe any special care for her. *Clements,* 252 Minn. at 4–5, 89 N.W.2d at 164–65.

Here, the relationship between the YWCA and Robarge bore little resemblance to the caretaking relationship of a hospital toward its patients or the custodial relationship between a jail and its inmates. Unlike hospitals or jails, the YWCA did not have custody or control of Robarge. Robarge did not entrust her health to the YWCA, and the YWCA did not accept the responsibility to care for her or to protect her from self-inflicted harm. The YWCA did not provide medical services or have expertise treating mental health problems. YWCA staff members did not have access to the medical histo-

ry of residents, nor did they have special training in recognizing suicidal tendencies. Simply put, the YWCA was not in a position to protect Robarge from committing suicide and Robarge had no reasonable expectation that the YWCA would protect her from committing suicide. Moreover, the YWCA did nothing to deprive Robarge of normal opportunities for self-protection. Thus, we conclude that the relationship between the YWCA and Robarge lacked the degree of dependence and control necessary to form a special relationship which created a duty on the part of the YWCA to prevent Robarge's suicide.

Because we conclude that no special relationship giving rise to a duty to protect Robarge from the harm she inflicted on herself existed between the YWCA and Robarge, we need not reach the issue of foreseeability. Absent a special relationship, no duty to act for the protection of another person arises. *Erickson,* 447 N.W.2d at 168–69. We therefore reverse the court of appeals and reinstate the summary judgment entered by the district court.

Reversed and summary judgment in favor of the YWCA is reinstated.

4. We have not had occasion to rule on the issue of a jail's duty to protect inmates from self-   inflicted harm.