JANE DOE, as Mother and Next Friend of John Doe, a Minor, Plaintiff-Appellant, v. BIG BROTHERS BIG SISTERS OF AMERICA, Defendant-Appellee (Philip Kaszynski *et al.*, Defendants).

First District (2nd Division)   No. 1—04—1985

Opinion filed August 16, 2005.

686

Susan E. Loggans & Associates (Susan E. Loggans, of counsel), and Law Office of Harry C. Lee (Harry C. Lee, of counsel), both of Chicago, for appellant.

Moore, Strickland & Whitson-Owen, of Chicago (Gary K. Moore and Darlene Strickland, of counsel), for appellee.

PRESIDING JUSTICE BURKE delivered the opinion of the court:

Plaintiff Jane Doe, as mother and next friend of John Doe, a minor, appeals from an order of the circuit court granting summary judgment in favor of defendant Big Brothers Big Sisters of America (America)

on the basis that America owed no duty to protect John from criminal conduct, particularly, sexual abuse by Philip Kaszynski, a mentor for Big Brothers Big Sisters of Metropolitan Chicago (Chicago), while John was enrolled in the Big Brothers program. On appeal, plaintiff contends that America owed John a duty based on: (1) its retained control over Chicago; (2) a special relationship, *i.e.*, it took custody of John; and (3) it voluntarily undertook to protect children from sexual abuse. For the reasons set forth below, we affirm.

## STATEMENT OF FACTS

America is an not-for-profit organization whose mission
"is to make a positive difference in the lives of children and youth, primarily through a professionally-supported One-to-One relationship with a caring adult, and to assist them in achieving their highest potential as they grow to become confident, competent, and caring individuals, by providing committed volunteers, national leadership, and standards of excellence."
Chicago is a member affiliate of America pursuant to a "Membership Affiliation Agreement" (Agreement) and provides community-based mentoring services to children in the Chicago area. Chicago has its own board of directors, officers, professional staff, including case managers, and volunteers.

Pursuant to the Agreement, America controls Chicago's service area and requires it to utilize a derivative of America's name and logo. Under the Agreement, America has the following obligations:

"7.1 To recognize the Member's autonomy in being responsible for the administration of its program ***.

7.2 To set guidelines for the practice and operation of a Member and to reassess and review such guidelines when deemed appropriate by [America]. Such guidelines are currently referred to as the 'Standards of Practice for One-To-One Service' [(Standards)] ***.
***

7.4 To review the member's policies and procedures at least every five years ***.
***

7.6 To provide an opportunity for consultation, resources, materials, programs and procedures in the areas of the Member's management, administration, programs, diversity, service delivery, public relationships, volunteer development, research and fund raising.

7.7 To plan and/or sponsor, conduct, and implement meetings, conferences, conventions, training programs, and institutes for professionals and volunteers *** in a timely and continuing way.
* * *

7.12 To make available to the Member rules and regulations and other standard materials required for the operation of a Member.

7.13 [America] will provide training for newly-employed Chief Professional Officer and other staff, on a timely basis."

Under the Agreement, Chicago has the following obligations:

"8.1 To provide One-To-One Mentoring Service ***.

***

8.3 To satisfy the Standards of Practice for One-To-One Service ***.

8.4 To adopt and adhere to the Standards of Practice for One-To-One Service ***. The Member will agree to conduct a self-assessment and participate in a review of policies, procedures and practices at least once every five years pursuant to guidelines developed by [America].

* * *

8.10 To participate in activities of [America] such as: Annual meetings, Regional meetings, National Professional Association meetings, institutes, workshops, study projects, etc. ***

8.11 To operate solely as a[n] [America] Affiliate not allied with any other organization unless specifically authorized by [America] ***.

* * *

8.14 To require any newly employed chief professional officer and other staff to attend training presented by [America] in a timely manner."

With respect to the relationship of the parties, the Agreement provides:

"13.1 This Agreement shall not constitute the Member an agent, *** employee, or servant of [America] for any purpose whatsoever, and it is understood between the parties hereto that the Member shall be an independent contractor ***."

Additionally, the Agreement provides:

"The parties, in addition to their recognition in Section 13.1 that an agency relationship is not intended, further recognize that (i) the Member is an autonomous organization, (ii) the Member has an independent and separate board of directors and officers responsible to manage its operations and affairs, *** (v) the Member, and not [America], has the right and power to hire, supervise and fire its employees, (vi) the Member, and not [America], has the function of selecting the volunteer Big Brothers and Big Sisters and carrying out and supervising its One-To-One Mentoring Service, and (vii) [America] does not control the day-to-day operations and affairs of the Member."

The Standards set forth the organization's vision, mission, and values as well as the following "standards of practice" with respect to affiliates:

"5. The affiliate has a *quality assurance system* that ensures that

all aspects of the affiliate's operations are reviewed and assessed on an annual basis, to include a review of its policies and procedures to ensure compliance with Standards ***, and ensures that the affiliate is in compliance with its own casework manual.[1]

\* \* \*

9. The affiliate employs a full time *executive* who is responsible to the board for the overall administration of agency operations.

***

b) The Executive has the overall responsibility for employing, supervision, evaluating, and terminating all paid and volunteer staff in accordance with the affiliate's personnel policies.

***

10. The affiliate *** has a human resource development and management system that is designed to effectively manage all paid, volunteer, and intern personnel.

***

12. The casework manual contains the policies, procedures, and forms to be used in implementing all One-To-One services.

a) The casework manual contains written board approved policies which address the following phases of One-To-One service delivery; written *eligibility criteria* for volunteer and youth participants, *youth outreach*, volunteer recruitment, *referrals, inquiry, intake, matching, supervision, closure,* and case record keeping.

b) The casework manual contains written board approved policies which address risk management issues for all One-To-One services offered by the affiliate, at a minimum: *** child sexual abuse prevention orientation, education and training ***." (Italics in original, designating terms defined in the Standards.)

With respect to volunteers, the Standards provide for an intake process where "[t]he professional staff conducts an in-person interview with the volunteer [to] elicit[ ] necessary information enabling the professional staff to prepare recommendations based upon the volunteer's ability to help meet the needs of the child." The intake process requires the following: an application, references, criminal history record, in-person interview, home environment assessment, and the opportunity for training.[2] Although America contemplates that all affiliates will follow the One-To-One mentoring program, the Standards

---

[1]The Standards define this as a "[d]ocument that contains all policies, procedures, and forms for service delivery."

[2]The Standards define this as "[t]he provision of information relative to the development or enhancement of the participants' skills that will provide opportunity for positive youth development."

provide a procedure for an affiliate to request that a different model be accepted.

In August 1998, Chicago employed Philip Kaszynski as a full-time case manager whose responsibility was to match volunteers to children. At this time, Kaszynski was trained by Susan McGee, assistant director, and Janet Takehara, another case manager. Both of these individuals, as well as others, supervised Kaszynski. Thereafter, Kaszynski switched to part-time and applied to become a volunteer. After McGee interviewed Kaszynski, he was accepted as a volunteer. In 1999, plaintiff enrolled her 10-year-old son, John, in the Big Brothers program upon the recommendation of a grief counselor following the death of John's grandfather. In November 2000, Kaszynski was matched with John as a mentor. Subsequently, Kaszynski sexually abused John until approximately March 2002, when he was arrested for pornography and sexual abuse of several children, including John.

On March 25, 2002, plaintiff filed a complaint against Kaszynski, America, and Chicago, alleging that Kaszynski sexually abused John. Count I was a claim against Kaszynski for sexual abuse, count II was a claim against Chicago and America (no theory stated), and count III was a claim against Chicago and America based on negligence. Thereafter, both America and Chicago moved to dismiss the complaint. Before the trial court ruled on the motions, it allowed plaintiff to file an amended complaint. On August 27, plaintiff filed her amended complaint. Count I was a negligence claim against Kaszynski, count II a claim against Chicago based on *respondeat superior*, count III a claim against Chicago based on negligent hiring and supervision, count IV a claim against America based on *respondeat superior*, and count V a claim against America based on negligent hiring and supervision. Chicago and America again moved to dismiss.

On January 17, 2003, the trial court granted Chicago's motion to dismiss count II pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2004)) with prejudice and granted America's motion to dismiss counts IV and V pursuant to both sections 2—615 and 2—619 with prejudice. Although the trial court dismissed these counts with prejudice, it nonetheless granted plaintiff leave to amend her complaint, but only with respect to America. On February 13, plaintiff filed her second amended complaint. On July 24, plaintiff filed her third amended complaint. Count I was a claim for negligence against Kaszynski, count II against Chicago for negligent hiring and supervision, and count III against America for negligent hiring and supervision.

On February 11, 2004, America filed a motion for summary judgment. America alleged that it owed no duty to protect John from

another's criminal conduct; that plaintiff did not allege any special relationship imposing a duty on it; and that there was no evidence of any voluntary undertaking by it creating a duty in favor of John. Attached to the motion were the depositions of Mack Koonce, executive vice president and chief executive officer of America, Susan McGee, Janet Takehara, Jane Doe, and John Doe. Also attached were the Agreement and Standards. According to Koonce's deposition, America's main office was in Philadelphia and it had eight regional offices, none of which were in Chicago. Koonce stated that the purpose of the regional offices was to work with affiliate members, such as Chicago. With respect to the relationship between America and Chicago, Koonce testified that America grants its name and support services to the affiliates in connection with marketing, fund development, and training and education. However, America and Chicago are separate corporations. With respect to training, Koonce stated that the training America offered to affiliates was periodic and optional and dealt with management (the basics of matching children to mentors), fund development, marketing, partnership development, and the board of directors. Koonce further stated that affiliates can have their employees trained by America through the regional office and that case managers are trained at the regional office. According to Koonce, if affiliates send their employees to a training program, they are supplied with manuals, which would include any training on sexual abuse prevention. Koonce stated that America requires all new chief professional officers and executive directors of affiliates to receive training, but that it does not directly train mentors.

With respect to control over Chicago, Koonce testified that America does not provide any type of supervision of the affiliates' employees, it does not provide operation manuals, and it does not provide a skeleton outline of appropriate behavior of a mentor—it is up to the affiliates to establish their own policies in these matters. Koonce admitted that America could cancel an affiliation for the reasons set forth in the Standards. Koonce further stated that America only reviews an affiliate's performance every five years and this is the only time America is able to randomly check the affiliate's policies or employees.

Thereafter, plaintiff responded to America's motion for summary judgment, attaching plaintiff's "Declaration" and Koonce's deposition.[3] On May 3, plaintiff moved to supplement her response, seeking to attach the America Bar Association's Criminal Sexual Abuse Study

---

[3]Again, a litigant has attached a "Declaration" in opposition to summary judgment, not an affidavit as contemplated by the summary judgment rule. As we stated in *People ex rel. Department of Labor v. General Electric Co.*, 347 Ill.

(ABA Study) that was undertaken by America in connection with claims and allegations of sexual abuse in its organization. Although the trial court originally denied this motion, after America stipulated to same, the trial court allowed plaintiff to supplement her response. On May 20, plaintiff filed a supplemental brief in response to America's motion for summary judgment, maintaining that the ABA Study showed the extent to which America engaged in activities to prevent sexual abuse at its member affiliates. On June 8, plaintiff filed an emergency motion to supplement her response, seeking to include a new expert witness on America's duty and its breach of same. The same day, the trial court granted plaintiff's motion to file a fourth amended complaint against Chicago, but denied her motion to file a fourth amended complaint against America. On June 21, the trial court denied plaintiff's emergency motion to supplement her response.

The trial court then conducted a hearing on America's motion for summary judgment. At the hearing, the court noted, to plaintiff, that her arguments made in connection with summary judgment did not track the allegations of her complaint. Specifically, her complaint alleged only negligent hiring and supervision; there were no allegations with respect to America's duty to protect John from criminal conduct. Plaintiff agreed with the court that either a special relationship or voluntary undertaking was required to impose liability on America. After hearing arguments, the court granted summary judgment in favor of America, concluding there was no special relationship and no voluntary undertaking. Accordingly, the court entered an order granting America's motion for summary judgment and included Supreme Court Rule 304(a) language. 155 Ill. 2d R. 304(a). This appeal followed.

---

App. 3d 72, 806 N.E.2d 1143 (2004):
> "[T]his is not a proper affidavit—it is not titled as such and does not comply with the requirements of Supreme Court Rule 191. 145 Ill. 2d R. 191. It is not sworn to or under oath, nor does it appear that [the plaintiff] took an oath at all before drafting the averments therein—a requirement of Rule 191. See *Robidoux v. Oliphant*, 201 Ill. 2d 324, 340, 343, 775 N.E.2d 987 (2002). See also *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 495, 782 N.E.2d 212 (2002) (noting that *Robidoux*'s analysis applied only to Rule 191 affidavits, which rule applies only to specific proceedings, including summary judgment). There is nothing in the summary judgment rules relating to 'declarations.' Rather, the rules discuss pleadings, admissions, depositions, and affidavits. This 'Declaration' falls under none of these." *Department of Labor*, 347 Ill. App. 3d at 74 n.1.

## ANALYSIS

A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1998); *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 530, 675 N.E.2d 897 (1996). The purpose of summary judgment is to determine whether a fact question exists, not to try a question of fact. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517, 622 N.E.2d 788 (1993). We review the trial court's granting of a summary judgment motion *de novo*. *McNamee v. Illinois*, 173 Ill. 2d 433, 438, 672 N.E.2d 1159 (1996).

### I. Independent Contractor/Control

Plaintiff first contends that the trial court erred in granting summary judgment in favor of defendant because America owed a duty to John that derived from its retained control of Chicago. Plaintiff relies on the principle set forth in section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)), but fails to cite to this provision in her brief. Although plaintiff acknowledges this principle has been utilized primarily in construction work cases, she argues it has broader application, *i.e.*, to the case here. Plaintiff also acknowledges that the Agreement specifically states Chicago is an independent contractor, but points to the following facts to show America retained actual and significant control over Chicago, creating a duty on its part: it created the model of mentoring (One-To-One) that Chicago was required to use; Chicago could only utilize this model; it dictated how to introduce its program to the public; it provided support services; it required affiliates to use a variation of America's name and logo; it required affiliates to adopt and adhere to the Standards; it provided consultation, resources, materials, programs, and procedures to affiliates; it planned and/or sponsored meetings, conferences, conventions, and training programs, including on the issue of sexual abuse; and it provided training for new executives and other staff.

America contends that section 414 is not applicable to a third-party assault situation like the one here because it is a limited exception to the general principle that an employer or general contractor is not liable for the activities of an independent contractor and we should not extend it. America further contends that it retained no supervisory or operational control over Chicago sufficient to create a duty on its part.

Plaintiff relies on *Coty v. U.S. Slicing Machine Co.*, 58 Ill. App. 3d

237, 373 N.E.2d 1371 (1978), and *Foster v. Englewood Hospital Ass'n*, 19 Ill. App. 3d 1055, 313 N.E.2d 255 (1974), in support of her argument that section 414 has broader application than the construction work cases. In *Coty*, the employer of a franchise sued the franchisor after she was injured by a meat slicing machine. *Coty*, 58 Ill. App. 3d at 239. The plaintiff relied on the employer-independent contractor line of cases, including section 414, to impose liability on the franchisor. *Coty*, 58 Ill. App. 3d at 241-42. The court noted that these cases were "somewhat inapposite" because the franchisee was not in the usual sense an independent contractor of an "employer." *Coty*, 58 Ill. App. 3d at 242. Nonetheless, the *Coty* court found that "the general rationale of the cases, that a person who possesses a right to supervise the internal operations of another's enterprise, which includes a right to veto an unsafe procedure, may be liable for the negligent failure to do so, can be applied to the franchise cases." *Coty*, 58 Ill. App. 3d at 242. However, "[the] right to interdict unsafe practices must consist of something more than a general right to make suggestions or recommendations or to order the work stopped or resumed." *Coty*, 58 Ill. App. 3d at 242. Ultimately, the *Coty* court concluded that the facts before it were insufficient to satisfy the reasoning of the employer-independent contractor theory and concluded that the franchisor was not liable. *Coty*, 58 Ill. App. 3d at 242.

In *Foster*, a wrongful death action against a hospital, anesthetist, nurse, and surgeon, the plaintiff sought to hold the surgeon liable for the nurse's negligence. *Foster*, 19 Ill. App. 3d at 1057. The court again found that the employer-independent contractor cases and section 414 were analogous to the situation before it. *Foster*, 19 Ill. App. 3d at 1061. Specifically, the *Foster* court stated

> "that analogous authority supports the general rule that a doctor may be held liable for the negligence of a hospital employee who is subject to the doctor's control or supervision. The law imposes a duty, for example, on one who entrusts work to an independent contractor, but retains the control of any part of the work, to exercise that control with reasonable care." *Foster*, 19 Ill. App. 3d at 1061.

The *Foster* court concluded there was sufficient evidence that the surgeon retained direct supervision and control over the nurse to allow the question to go to the jury. *Foster*, 19 Ill. App. 3d at 1065.

*Coty* and *Foster* are the only two occasions when Illinois courts have extended section 414 to cover nonconstruction work case scenarios. Neither case, however, analyzed section 414 or stated any specific analysis or rationale for extending section 414 to the circumstances before the courts. Rather, *Coty* and *Foster* simply found

the principle analogous. Moreover, these cases are over 25 years old. No recent case has applied section 414 to any situation other than a construction work case.

■ Even assuming we found section 414 applicable, we find that its requirements cannot be satisfied under the facts present here. Section 414 is an exception to the general rule that an employer of an independent contractor is not liable for the independent contractor's acts or omissions. *Moorehead v. Mustang Construction Co.*, 354 Ill. App. 3d 456, 460, 821 N.E.2d 358 (2004). Section 414 is deemed the "retained control" concept and provides:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

The theory is further explained by Comment *c*, which provides:

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, *** to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, Comment *c*, at 388.

Plaintiff argues that the question of whether a duty exists under section 414 turns on who controls safety, relying on *Moss v. Rowe Construction Co.*, 344 Ill. App. 3d 772, 801 N.E.2d 612 (2003). According to plaintiff, America here retained control of the safety and protection of children enrolled in the Big Brothers program. In *Moss*, the Fourth District rejected the notion that the question was who retained control over the means and methods of performance of the work. *Moss*, 344 Ill. App. 3d at 777. According to the *Moss* court, "[t]he issue is not control of the 'means and methods' of performing the task, but rather who contractually and/or physically has the duty to control safety of the project." *Moss*, 344 Ill. App. 3d at 777. Specifically, the *Moss* court held that "[t]he law requires the trial court to review the contractual language regarding the general contractor's duty to maintain safety of workers." *Moss*, 344 Ill. App. 3d at 783.

This narrow analysis has subsequently been rejected, specifically

by *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 807 N.E.2d 480 (2004), relied upon by America. The *Martens* court noted that, if courts found language in a contract with respect to the right to control safety alone sufficient to subject a general contractor to liability under section 414, "then the distinction in Comment *c* \*\*\* between retained control versus a general right of control would be rendered meaningless." *Martens*, 347 Ill. App. 3d at 316. The *Martens* court specifically rejected the plaintiff's argument, based on *Moss*, that "the 'central issue is the defendant's ability to affect worker safety.' [Citation.]" *Martens*, 347 Ill. App. 3d at 318. Rather, according to the *Martens* court, "[t]he central issue is retained control of the independent contractor's work, whether contractual, supervisory, operational, or some mix thereof." *Martens*, 347 Ill. App. 3d at 318. Specifically, the court stated that

> "the existence of a safety program, safety manual or safety director does not constitute retained control *per se*; the court must still conduct an analysis pursuant to the section 414 retained control exception. [Citation.] We recognize, of course, that if a defendant's safety program sufficiently affected a contractor's means and methods of doing its work, then such program could bring the defendant within the ambit of the retained control exception." *Martens*, 347 Ill. App. 3d at 318-19.

See also *Ross v. Dae Julie, Inc.*, 341 Ill. App. 3d 1065, 1071, 793 N.E.2d 68 (2003): *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 839, 719 N.E.2d 174 (1999). In other words, Comment *c* must be incorporated into the duty analysis. *Martens*, 347 Ill. App. 3d at 319; *Ross*, 341 Ill. App. 3d at 1072.

As such, again,

> "[w]hether a duty exists under section 414 is a question of law and turns on whether the defendant controls the work in such a manner that he should be held liable. [Citation.] For the rule to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress, or to make recommendations which may or may not be followed. There must be such a retention of a right of supervision that the subcontractor is not entirely free to do the work in his own way." *Moorehead*, 354 Ill. App. 3d at 459.

The *Martens* court undertook a detailed analysis of the facts of the case before it with respect to whether the general contractor retained control by contract, supervision, or operation. With respect to contractual control, the court noted that the general contractor was responsible for initiating and supervising a safety program; however, the subcontractor, in accordance with the general contractor's safety program, provided a safety manual to the general contractor that

dictated that its foreman was responsible for putting safety rules into practice. *Martens*, 347 Ill. App. 3d at 316. The *Martens* court refused to "equate those safety responsibilities with control over the means and methods of [the subcontractor's] steel erection work, particularly where [the subcontractor] maintained contractual control of the supervision and safety of its ironworkers." *Martens*, 347 Ill. App. 3d at 316.

With respect to supervisory control, the *Martens* court concluded that the plaintiffs failed to establish that the general contractor supervised the subcontractor's work or maintained extensive work site presence. *Martens*, 347 Ill. App. 3d at 317. Specifically, the general contractor's project manager was on the site only a couple of hours per week, its safety director visited the site two times per week, and the general contractor was not able to stop work or instruct or supervise the workers. *Martens*, 347 Ill. App. 3d at 317. Accordingly, the court concluded that the general contractor did not retain or exercise authority over the subcontractor's method of operation. *Martens*, 347 Ill. App. 3d at 318.

Lastly, with respect to operational control, the *Martens* court concluded that the facts demonstrated that the independent contractor was "free to perform its work in its own way and only [the independent contractor] exercised control over plaintiff's work." *Martens*, 347 Ill. App. 3d at 319. In other words, the general contractor did not have "extensive involvement with the operative details of the work." *Martens*, 347 Ill. App. 3d at 319. Initially, we note that plaintiff here did not allege in her complaint that America controlled the method and manner of work or the safety and protection of children. See *Ross*, 341 Ill. App. 3d at 1070. In fact, there are no allegations at all with respect to the protection of children in plaintiff's complaint.

We find that America did not retain control over Chicago or its volunteers, either by contract, supervision, or operation, let alone control over the methods of child protection or sexual abuse prevention. Contractually, there is nothing in the Agreement as to procedures or standards for protecting children from sexual abuse. In fact, a review of the Agreement does not disclose that the terms "sexual abuse, molestation, assault" or anything akin were used at all. Moreover, there is nothing in the Agreement providing that America was responsible for initiating and/or supervising a program directed at child protection. Although the contract requires America to provide the opportunity for training, there is nothing that states this training must include protection of children, and more specifically, there is nothing that specifies the extent and detail of any such training. With respect to the model required, *i.e.*, One-To-One, contrary to plaintiff's

argument, it is not the sole model that an affiliate could utilize. The Standards clearly provide that an affiliate can petition America for approval of a different type of model of mentoring. With respect to plaintiff's argument that America dictated how Chicago was to introduce its services to the community, there is no evidence of this in the Agreement. There is nothing in the Agreement dictating the nature of marketing, advertising, or the like. With respect to use of America's name and logo, we find this is insufficient in itself to demonstrate America contractually retained control over Chicago, let alone over procedures regarding child protection. See, *e.g.*, *Glover v. Boy Scouts of America*, 923 P.2d 1383, 1388 (Utah 1996) (finding that the requirement of the Boy Scouts of America (BSA), the national organization, that scouts wear the Boy Scout uniform and use patches and insignia was insufficient to create a question of fact as to BSA's right to control local troops).

The Standards likewise do not demonstrate that America retained contractual control over Chicago. The only reference in the Standards to sexual abuse requires Chicago's board of directors to adopt policies that address child sexual abuse protection in *its* casework manual. However, the Standards do not provide suggestions, recommendations, or even a skeletal framework of what those policies should or could entail.

With respect to supervisory control, clearly there is no evidence that America retained any supervision over Chicago or its volunteers. There is no evidence that any member of America's staff was present at Chicago's office except for one time every five years. Moreover, there is no evidence that any of America's staff ever supervised the volunteers and children or that it had any control over how the volunteers and children interacted, including what they did, where they went, etc.

Lastly, with respect to operational control, the evidence clearly demonstrates that America retained no control over Chicago's operations or the volunteers. The Agreement makes it clear that Chicago is an autonomous unit and responsible for its own day-to-day operations. Specifically, Chicago has an executive who possesses overall responsibility for the employment, supervision, evaluation, and termination of all staff and volunteers. Koonce's deposition testimony supports this. Moreover, Chicago's board is required to adopt policies and procedures, which it must incorporate into its casework manual in connection with all aspects of its internal functioning. See, *e.g.*, *Anderson v. Boy Scouts of America, Inc.*, 226 Ill. App. 3d 440, 444-45, 589 N.E.2d 892 (1992) (the plaintiffs failed to establish a duty on the part of the BSA on the basis of *respondeat superior* where there were "no provisions in

the charter, bylaws, rules and regulations promulgated by the BSA \*\*\* which specifically grant[ed] BSA \*\*\* direct supervisory powers over the method or manner in which adult volunteer scout leaders accomplish[ed] their tasks''); *Golden Spread Council, Inc. No. 562 of Boy Scouts of America v. Akins*, 926 S.W.2d 287, 290 (Tex. 1996) (holding that the BSA had no vicarious liability under a theory of *respondeat superior* to a scout molested by a scout leader where the BSA and the local council, Golden, were separate corporations, the BSA had no right to control Golden's activities, and Golden had its own board of directors).

There is simply no evidence in the record to demonstrate America retained direct supervisory control over the method and manner in which Chicago or its mentors accomplished their tasks, either by contract, supervision, or operation. Although America did offer its program to local affiliates, it did not administer the program. More importantly, there is no evidence that America adopted and implemented any policies, procedures, programs, or systems directed at sexual abuse prevention that Chicago was required to adopt and implement. There is no evidence that America promulgated any child protection policies, standards, or measures to which Chicago's volunteers were subject. America did not have a sex abuse prevention or child protection committee or any individual in a position whose sole function was to oversee child protection issues or implement policies. There is also no evidence that Chicago's volunteers were required to participate, at the behest of America, in child sexual abuse prevention training. There is no evidence that America monitored compliance with any measures or whether volunteers were trained properly. On the contrary, the evidence shows that Chicago was free to institute its own policies and procedures with respect to child sexual abuse prevention without input from America. Although America may have given some guidelines regarding child protection in some of its training or seminars and may have "participated" on this subject in the sense it may have given recommendations or printouts to Chicago, it is clear that America does not control what is done or is not done with respect to child protection. See *Clifford v. Wharton Business Group, L.L.C.*, 353 Ill. App. 3d 34, 48, 817 N.E.2d 1207 (2004) (holding that a general contractor was not liable under section 414 because there was no evidence it "exercised the level of control" necessary since it "did not control the operative detail of [the subcontractor's] methods of work, such that [the subcontractor] was not entirely free to do the work in its own way," and where the general contractor did not direct the subcontractor's employees as to how to perform their tasks, did not hold safety meetings, and did not maintain safety rules for the

subcontractors). But see *Moorehead*, 354 Ill. App. 3d at 460-61 (holding that the plaintiff sufficiently established a duty on the part of the defendant general contractor under section 414 where there was evidence that the general contractor was responsible for initiating, maintaining and supervising all safety procedures; it initiated a specific safety program and designated an individual whose sole function was to investigate for safety hazards; and its safety manager was on site on a weekly basis to ensure compliance with its safety standards); *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1063, 728 N.E.2d 726 (2000) (holding there was a factual question as to whether the general contractor was liable under section 414 based on its extensive control of safety standards, including 29 different safety measures and procedures that workers were subject to; it required workers to participate in its safety program; it had authority to instruct workers and stop work; and it had pervasive supervision and constant monitoring of the work).

■ We find that plaintiff failed to present evidence sufficient to create a genuine issue of material fact that, assuming section 414 was applicable, America owed a duty to John under the theory of retained control. Accordingly, we affirm the trial court's grant of summary judgment on this basis.

## II. Special Relationship/Custodian

Plaintiff next maintains that America owed John a duty because it had a special relationship with him based on the fact it took custody of him.[4] Plaintiff maintains that America voluntarily undertook custody of John since he was no longer under his mother's care and was placed in the care of another person. According to plaintiff, the fact that John was enrolled through the Chicago affiliate, rather than America, does not prevent a finding of a special relationship since the program John was enrolled in, One-To-One, was America's required program.

America contends that it did not take custody of John, it thus was not a custodian and, as such, there was no special relationship. In any event, America maintains that there is no evidence it had any control over John where it was separated from him by half a continent and had no authority over him.

■ "Generally, a person is not liable for harm to another resulting from the person's failure to defend the other against a third party's criminal attack." *Platson v. NSM, America, Inc.*, 322 Ill. App. 3d 138, 146, 748 N.E.2d 1278 (2001). However, where the plaintiff bears "a 'special relationship' to the defendant when the attack by the third

---

[4]Again, plaintiff did not allege this theory or allegation with respect to a special relationship in her complaint.

party occurred," an exception to the general rule exists. *Platson*, 322 Ill. App. 3d at 146. A special relationship exists, under section 314A(4) of the Restatement (Second) of Torts where "one voluntarily takes custody of another so as to deprive the other of his normal opportunities for protection." *Platson*, 322 Ill. App. 3d at 146. However, "[e]ven a person bearing a special relationship to another has a duty to protect that person only from reasonably foreseeable attacks by third parties." *Platson*, 322 Ill. App. 3d at 146. In *Platson*, the court noted that "[w]hat it means to 'take custody of another' or 'deprive another of his normal opportunities for protection' " is not addressed by section 314A(4), nor many Illinois cases. *Platson*, 322 Ill. App. 3d at 146. In looking to persuasive authority outside of Illinois, the *Platson* court relied on one case that held "that to assume custody of a child is to stand '*in loco parentis* to the child, accepting all the rights and responsibilities that go with that status.' [Citation.]" *Platson*, 322 Ill. App. 3d at 147. In addition, " '[t]ypically, the plaintiff [in a section 314A(4) relationship] is in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare.' " *Platson*, 322 Ill. App. 3d at 147, quoting *Donaldson v. Young Women's Christian Ass'n*, 539 N.W.2d 789, 792 (Minn. 1995). Accordingly, the *Platson* court found that " '[t]o establish a custodial relationship between an employer and a minor employee [the situation in *Platson*], there must be proof that the employer voluntarily assumed the additional responsibilities of a custodian towards the child.' [Citation.]" *Platson*, 322 Ill. App. 3d at 147.

The only case in Illinois to address a situation or organization similar to that here is *Doe v. Goff*, 306 Ill. App. 3d 1131, 716 N.E.2d 323 (1999), in which the plaintiff-minor, a former Boy Scout, sued the BSA and the Rainbow Council Boy Scouts of America (the local group) after he was sexually molested while at a Boy Scouts camp. *Doe*, 306 Ill. App. 3d at 1133. One of the theories the plaintiff relied upon to hold both the BSA and local council liable was that he had a "special relationship" with them by virtue of their taking voluntary custody of him. *Doe*, 306 Ill. App. 3d at 1134. Without analyzing the issue, the *Doe* court stated that "[a]s the plaintiff's voluntary custodian, the appellees had a duty to protect him from foreseeable harm." *Doe*, 306 Ill. App. 3d at 1134. The court nonetheless declined to hold the defendants liable based on its finding that the criminal attack by the adult volunteer scout leader was not foreseeable. *Doe*, 306 Ill. App. 3d at 1134.

As noted above, *Doe* does not analyze the issue; it merely stated that a special relationship existed. Thus, *Doe* offers no aid in the

instant case. The question here is whether America voluntarily took custody of John. "Custody" is defined as "control of a thing or person with such actual or constructive possession as fulfills the purpose of the law or duty requiring it." Webster's Third New International Dictionary 559 (1993). "Custodian" is defined as "one that guards and protects and maintains." Webster's Third New International Dictionary 559 (1993). "Custodial" is defined as "relating to or marked by guardianship or maintaining safety." Webster's Third New International Dictionary 559 (1993).

■ We find that there is no evidence and no basis to find that America took voluntary custody of John, thus imposing a duty upon it. First, America did not have actual or constructive possession of John. As America points out, it was halfway across the country. Moreover, America did not assume any of the responsibilities associated with the status of custodian; it had no ability to guard or protect John; it had no authority over him; and it had no manner in which to dictate any of his activities, how he was cared for, etc. As such, we find that plaintiff failed to present evidence sufficient to create a genuine issue of material fact that America stood in a special relationship with John, thus imposing a duty on it. Accordingly, we affirm the trial court's grant of summary judgment on this basis. Based on our resolution of the special relationship issue, we need not address the question of foreseeability.

### III. Voluntary Undertaking

Plaintiff next contends, alternatively, that America voluntarily undertook a duty to protect John from sexual abuse under section 324A of the Restatement (Second) of Torts. Plaintiff maintains that America voluntarily assumed a duty to protect John and others from sexual abuse since it engaged in a range of activities designed to prevent sexual abuse. Specifically, plaintiff argues that issues with respect to sexual abuse were included in the Standards, which affiliates were required to comply with; America provided other information on the prevention of abuse; and America reviewed the policies and procedures of the affiliates.

America contends that there is no evidence that it undertook a duty to render the services alleged by plaintiff and, even if it did, its undertaking was limited in scope. America maintains that the extent of its undertaking to provide services was limited to the Standards and to present training and education programs on a voluntary basis. With respect to the Standards, America argues that this was created to ensure consistency in the kind of mentoring services provided and was not intended to be a child safety manual. Specifically, there is only

one reference to child sexual abuse prevention in the Standards and this reference tells affiliates to create their own policies.

■ The "voluntary undertaking" theory of liability is set forth in section 324A of the Restatement (Second) of Torts and provides:

> " 'One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.' " *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 415-16, 583 N.E.2d 538 (1991), quoting Restatement (Second) of Torts § 324A (1965).

" 'However, under the voluntary undertaking doctrine of liability, the duty of care to be imposed upon the defendant is limited to the extent of the undertaking. [Citation.]' [Citation.]" *Chelkova v. Southland Corp.*, 331 Ill. App. 3d 716, 722, 771 N.E.2d 1100 (2002). "The Illinois Supreme Court has indicated that a 'narrow construction' of voluntary undertakings is 'supported by public policy.' [Citation.]" *Jakubowski v. Alden-Bennett Construction Co.*, 327 Ill. App. 3d 627, 641, 763 N.E.2d 790 (2002). Moreover, with respect to the voluntary undertaking theory, courts have distinguished between nonfeasance and misfeasance. *Jakubowski*, 327 Ill. App. 3d at 640. Specifically, "where a duty of care is imposed by reason of a voluntary undertaking, breach of that duty can be found only where there is misfeasance rather than nonfeasance, unless plaintiff can show that he reasonably relied on the defendant for protection." *Stephen v. Swiatkowski*, 263 Ill. App. 3d 694, 704, 635 N.E.2d 997 (1994).

Initially, in *Jakubowski*, the court noted that the plaintiff's

> "complaint not only did not raise the voluntary undertaking theory, but none of the allegations involve any misfeasance or affirmative negligent acts on the part of [the defendant] with respect to a voluntary undertaking. Rather, plaintiff, under an ordinary negligence theory, alleged only acts of nonfeasance, such as allowing or permitting conditions to exist unguarded or unprotected, failing to implement safety measures, failing to institute safeguards, failing to post warnings and failing to place fencing or barricades around the premises." *Jakubowski*, 327 Ill. App. 3d at 640.

The *Jakubowski* court concluded that such allegations "cannot be a basis for tort liability to a third party *** under a voluntary undertak-

ing theory." *Jakubowski*, 327 Ill. App. 3d at 640. The same is true here. Plaintiff did not allege the voluntary undertaking theory in her complaint. Similarly, plaintiff did not allege misfeasance, but rather nonfeasance. We could affirm summary judgment on this basis alone.

Plaintiff relies on *Platson* in support of her argument that America voluntarily undertook a duty to protect John. However, *Platson* does not aid plaintiff. In *Platson,* a high school student, involved in a work-study program, sued the defendant-employer after she was sexually abused on its premises by one of its employees. *Platson,* 322 Ill. App. 3d at 140. The trial court dismissed the plaintiff's complaint, but the appellate court reversed, finding that the plaintiff sufficiently stated a cause of action with respect to the defendant's liability under section 324A. *Platson,* 322 Ill. App. 3d at 149. Specifically, the *Platson* court found that the employer had specifically, in the work-study program agreement, agreed to provide adequate supervision of the student at all times. *Platson,* 322 Ill. App. 3d at 150. According to the *Platson* court, by this agreement, the defendant assumed the school's duty to protect the student, *i.e.*, it voluntarily undertook such a duty. *Platson,* 322 Ill. App. 3d at 150-51. Here, America, unlike the *Platson* defendant, did not specifically assume a duty to supervise or protect John in its agreement with Chicago. As such, *Platson* is distinguishable and does not command the same conclusion here.

Several other Illinois cases are illustrative on when a voluntary undertaking will be found and when it will not. In *Chelkova,* the court held that the franchisor of a convenience store did not voluntarily undertake a duty to provide security to the franchisee's employees where, although the franchisor made security recommendations to the owner, the owner was responsible for disseminating such information to its employees; these recommendations were not mandatory; the franchisor did not have the ability to enforce the recommendations; the franchisor could not terminate the franchise agreement if the franchisee failed to comply with the recommendations; although the franchisor had installed a security system for the owner, it did not instruct the owner on how to operate it; and the franchisor was not responsible for management of the employees or the day-to-day operations of the store. *Chelkova,* 331 Ill. App. 3d at 723. Similarly, in *Castro v. Brown's Chicken & Pasta, Inc.*, 314 Ill. App. 3d 542, 732 N.E.2d 37 (2000), the court held that the franchisor did not voluntarily undertake a duty to provide security for stores where the franchisor did not mandate any security measures, it did not provide the franchisees with any written materials addressing security, and the franchisees were free to operate their stores in the way they saw fit and could implement any security measures they deemed necessary. *Castro,* 314 Ill. App. 3d at 550.

Conversely, in *Decker v. Domino's Pizza, Inc.*, 268 Ill. App. 3d 521, 644 N.E.2d 515 (1994), the court concluded that the franchisor voluntarily undertook a duty with respect to security measures where it had a formal standards committee that recommended to franchisees what security measures to adopt, it adopted a cash-management system that was mandatory on all franchisees, it had a consultant employed to ensure all franchisees complied with its security standards, and its consultant trained the managers at the local stores in safety and security. *Decker*, 268 Ill. App. 3d at 528. Similarly, in *Martin v. McDonald's Corp.*, 213 Ill. App. 3d 487, 572 N.E.2d 1073 (1991), the court again concluded that the franchisor voluntarily undertook a duty to provide security where a branch of the company was designated to deal with security problems, it created a "bible" for store security, and its regional security manager checked to ensure that security standards and policies were followed. *Martin*, 213 Ill. App. 3d at 491.

■ The instant case is more akin to *Chelkova* and *Castro*. America did not implement a child protection or child sexual abuse prevention program that was mandatory on Chicago, nor did it create a "bible" of required procedures. Specifically, America did not specify any details of policies that Chicago was required to adopt or measures it was required to take. Additionally, America did not have a formal committee on child protection, nor did it employ an individual responsible for ensuring implementation and compliance, and it did not monitor Chicago to determine whether it was complying with standards instituted by America. Although America may have made some information available to attendees of seminars, there is no evidence the attendees were required to disseminate this information or put it into place. There is also no evidence that America could terminate the affiliation based on Chicago's failure to comply with any child protection procedures. As in *Chelkova* and *Castro*, Chicago was responsible for running its day-to-day operations and to adopt child protection or sexual abuse prevention policies as it deemed necessary. We therefore find that plaintiff failed to present evidence sufficient to create a genuine issue of material fact whether America voluntarily undertook a duty to protect John from sexual abuse. Accordingly, we affirm the trial court's grant of summary judgment on this ground. Based on our resolution of this issue, we need not address the question of plaintiff's reliance.

## CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

WOLFSON and GARCIA, JJ., concur.