# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Wells v. Endicott*, 2013 IL App (5th) 110570

---

| | |
|---|---|
| Appellate Court Caption | MATTHEW C. WELLS, as Special Administrator of the Estate of Joseph M. Schoolfield, Deceased, Plaintiff-Appellant, v. SCOTT P. ENDICOTT and VALERIE SCHOOLFIELD, Defendants, and DENNIS R. ENDICOTT, KIMBERLY D. ENDICOTT, SOPHIA RAWLINGS, and ERWIN McEWEN, Director of Children and Family Services, Sued Individually, Defendants-Appellees. |
| District & No. | Fifth District<br>Docket Nos. 5-11-0570, 5-12-0116 cons. |
| Rule 23 Order filed<br>Motion to publish<br>granted<br>Opinion filed | April 17, 2013<br><br>May 31, 2013<br>May 31, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action by the natural father of a three-year-old boy who died from a beating administered by his mother's paramour, the trial court's dismissal of the father's complaint against the paramour's parents, in whose home the boy and his mother lived, the director of the Department of Children and Family Services and a child welfare specialist was upheld, since the boy was in his mother's custody, there were no allegations that the paramour's parents voluntarily undertook any duties to the boy or that his mother entrusted the boy to the care of the paramour's parents, plaintiff failed to plead facts sufficient to establish a voluntary custodian/protectee relationship between the boy and the paramour's parents, the boy was not in the custody of the state, and the state did not create the danger he faced. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 10-L-928; the Hon. A.A. Matoesian, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Michael V. Oltmann and Michael R. Bilbrey, both of Law Offices of Michael R. Bilbrey, P.C., of Glen Carbon, for appellant. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Mary E. Welsh, Assistant Attorney General, of counsel), for appellee Erwin McEwen. |
| | Richard A. Cary, of Wham & Wham Lawyers, of Centralia, and Jeffery A. Cain, of Freeark, Harvey & Mendillo, of Belleville, for appellees Dennis R. Endicott and Kimberly D. Endicott. |
| | Tara I. English and Stephen C. Mudge, both of Reed, Armstrong, Mudge & Morrissey, P.C., of Edwardsville, for appellee Sophia Rawlings. |
| | |
| Panel | JUSTICE STEWART delivered the judgment of the court, with opinion. Presiding Justice Spomer and Justice Goldenhersh concurred in the judgment and opinion. |

**OPINION**

¶ 1     In this appeal we review the dismissal of a complaint. In 2009, a three-year-old boy was severely beaten by his mother's paramour, and he eventually died from his injuries. The boy's natural father brought suit against the paramour's parents alleging that they negligently failed to protect the minor after voluntarily allowing him to live with his mother in their home. The plaintiff also brought suit under 42 U.S.C. § 1983 (2006) against the director of the Department of Children and Family Services and one of its child welfare specialists. The complaint alleged that the director and the child welfare specialist violated the boy's right to personal security and safety under the due process clause of the fourteenth amendment to the United States Constitution. The circuit court granted the parents' and the child welfare specialist's motions to dismiss under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2010)) and *sua sponte* dismissed the claims against the director. The plaintiff appealed. We affirm for the reasons that follow.

¶ 2 BACKGROUND

¶ 3 This cause of action arises out of a civil complaint surrounding the death of a three-year-old boy, Joseph Schoolfield. This appeal relates only to defendants Dennis Endicott, Kimberly Endicott, Erwin McEwen, and Sophia Rawlings.

¶ 4 On September 7, 2010, the plaintiff, Matthew C. Wells, Joseph's father, filed a complaint as special administrator of Joseph's estate against the defendants seeking monetary damages under the Survival Act (755 ILCS 5/27-6 (West 2008)), under the Wrongful Death Act (740 ILCS 180/0.01 to 2.2 (West 2008)), and for deprivation of substantive due process rights under 42 U.S.C. § 1983 (2006). He named as defendants Valerie Schoolfield, who is Joseph's mother; Scott Endicott, who is Valerie's paramour; Scott's parents Dennis and Kimberly Endicott (the Endicotts); Sophia Rawlings, who is a child welfare specialist with the Illinois Department of Children and Family Services (the Department); and Erwin McEwen, who was the Department's director at the relevant time.

¶ 5 The plaintiff alleged the following facts common to all counts. On September 5, 2008, Valerie dropped Joseph off at the Karen Levy Daycare, where caregivers discovered bruises all over his body. The daycare reported its suspicions that Joseph had been abused to the Department. On September 24, 2008, the daycare again reported suspicions that Joseph was being abused to the Department after he was dropped off with more bruises. On September 25, 2008, unknown agents from the Department took Joseph into custody after investigating his injuries and interviewing the daycare provider. On September 26, 2008, Joseph was interviewed at a child advocacy center, where it was revealed that he had been beaten by Scott with a belt.

¶ 6 On October 7, 2008, the court entered a temporary custody order. The court found that Valerie had received notice and was present at the hearing and that Joseph's biological father could not be found after a diligent search was made to locate him. The court found that there was probable cause for the filing of the petition based on unexplained bruising on Joseph. The court found that there was no immediate and urgent necessity to remove the minor from the home. Temporary custody of Joseph was awarded to Valerie. The Department was ordered to investigate the need for services and to provide the needed services. Scott was ordered to have no contact with Joseph. The court found that Scott agreed to vacate the premises where Valerie and Joseph lived and not return prior to further order.

¶ 7 On October 9, 2008, the Department assigned Joseph's case to Rawlings. At that time the Department instructed Rawlings that Joseph's case was high risk and required weekly visits to Joseph's family. Rawlings saw Joseph within one week of her assignment. On or about October 23, 2008, she attempted two more visits with Joseph. Valerie agreed to bring Joseph to the Department's office. On November 6, 2008, Rawlings visited Toddle Towne Learning Center, where the director reported that she had seen a bruise on Joseph's forehead. On November 11, 2008, Rawlings returned to Toddle Towne Learning Center to visit Joseph, and she observed bruises on his forehead, ribs, and left forearm. At that time she learned that Scott had beaten Joseph and that he was living with Joseph and Valerie despite the order that he have no contact with Joseph. On November 12, 2008, a staff member from Toddle Towne Learning Center called the Department to report that Joseph had another bruise.

¶ 8        On November 23, 2008, an unknown child protection investigator and an unknown intact family worker from the Department visited Joseph and Valerie at their residence. They were living in Madison County in a home the Endicotts owned but did not reside in. Joseph had bruising on his eye, cheek, and temple. The plaintiff alleged that the child protection investigator instituted a safety plan that placed the custody of Joseph with the Endicotts, but that allegation is not supported by the record.

¶ 9        On December 2, 2008, the court entered an order stating that the case remained "status quo." The court ordered Scott to have "no contact whatsoever" with Joseph.

¶ 10      On January 21, 2009, Joseph was severely beaten by Scott at the Endicotts' home in Clinton County. The Endicotts reside in this residence. On January 24, 2009, Joseph died from head and brain injuries he suffered in the beating.

¶ 11      Currently, Valerie and Scott are serving sentences at Illinois correctional centers. Because this appeal does not involve the counts against Scott or Valerie, we will not discuss them. The Endicotts, McEwen, and Rawlings filed motions to dismiss the plaintiff's complaint. The plaintiff filed responses to their motions asking that the motions to dismiss be denied or, alternatively, that he be allowed to amend his complaint. On March 30, 2011, the trial court dismissed the plaintiff's complaint and granted him leave to file an amended complaint.

¶ 12      On April 27, 2011, the plaintiff filed an amended complaint. The plaintiff brought four counts against Dennis Endicott and four counts against Kimberly Endicott. The counts against the Endicotts mirror each other and will be addressed together. Counts VII and XI of the amended complaint alleged causes of action against the Endicotts for negligent breach of a voluntary custodian/protectee relationship under the Survival Act. Counts IX and XIII alleged the same negligence under the Wrongful Death Act. These counts allege that the Endicotts negligently breached the voluntary custodian/protectee relationship duty they owed Joseph to protect him from reasonably foreseeable attacks by third parties, and that they were guilty of negligence by allowing Scott to batter Joseph. In support of these counts, the plaintiff alleged that the Endicotts voluntarily allowed Valerie and Joseph to stay at their homes in Madison and Clinton Counties and that because he was a child, Joseph was vulnerable and dependent on them for a place to live. He further alleged that because Joseph was vulnerable and depended on the Endicotts for a place to live, a voluntary custodian/protectee relationship existed between them and Joseph. The plaintiff alleged that as the voluntary custodian, they had a duty to protect Joseph from reasonably foreseeable attacks by third parties.

¶ 13      The plaintiff alleged that on October 7, 2008, the court entered an order that stated that Scott was to have no contact with Joseph and was to vacate the premises owned by the Endicotts in Madison County. The plaintiff asserted that based upon reasonable information and belief, the Endicotts were aware of the no-contact order entered by the court. The plaintiff alleged that on December 2, 2008, the court entered an order that Scott was to have no contact with Joseph and that based upon reasonable information and belief the Endicotts were present at the proceeding and were aware of the no-contact order. The plaintiff alleged that it was reasonably foreseeable that Scott would harm Joseph because he was the subject of the no-contact order that was entered for Joseph's protection.

¶ 14    The plaintiff alleged that based upon reasonable information and belief the Endicotts allowed Scott to enter their residence in Madison County while Joseph was at the home, in violation of the October 7, 2008, order, and batter Joseph. The plaintiff further alleged that based upon reasonable information and belief, the Endicotts knew or reasonably should have known that Scott was alone with Joseph in their Madison County home and that he had battered Joseph in the residence. The plaintiff alleged that based upon reasonable information and belief the Endicotts were present when Scott entered their residence in Clinton County on January 21, 2009, that they knew or reasonably should have known that Scott was alone with Joseph, and that they knew or reasonably should have known that Scott battered Joseph that day while they were in the home. The plaintiff alleged that the Endicotts breached the duty they owed Joseph to protect him from foreseeable attacks by third parties and were guilty of negligence for allowing Scott to enter their residences in Madison and Clinton Counties and batter Joseph. The plaintiff asserted that as a direct and proximate result of the Endicotts' breach of duty, Joseph suffered severe injuries, which caused him great pain and anguish, and ultimately resulted in his death.

¶ 15    Counts VIII, X, XII, and XIV of the amended complaint alleged causes of action against the Endicotts for the negligent breach of a voluntary undertaking under the Survival Act and under the Wrongful Death Act. In these counts, the plaintiff alleged that between September 5, 2008, and November 25, 2008, the Endicotts voluntarily allowed Valerie and Joseph to stay at their residence in Madison County and that between November 25, 2008, and January 21, 2009, they voluntarily allowed Valerie and Joseph to stay at their residence in Clinton County. He asserts that because Joseph was a child, he was helpless to adequately aid or protect himself. The plaintiff alleged that while under no duty to do so, the Endicotts took charge of Joseph by permitting him to stay at their residences in Madison and Clinton Counties and voluntarily undertook a duty to protect Joseph and keep him safe.

¶ 16    The plaintiff alleged that on October 7, 2008, the court entered a no-contact order prohibiting Scott from having contact with Joseph and ordering him to vacate the premises owned by his parents in Madison County. The plaintiff alleged that based upon reasonable information and belief, the Endicotts were aware of this no-contact order. The plaintiff alleged that on December 2, 2008, the court again entered a no-contact order prohibiting Scott from having any contact with Joseph. He asserted that based upon reasonable information and belief, the Endicotts were present at the proceeding and were aware that a no-contact order was entered. The plaintiff alleged that it was reasonably foreseeable that Scott would harm Joseph because there was a no-contact order entered against Scott for Joseph's protection.

¶ 17    The plaintiff asserted that based upon reasonable information and belief, on November 6, 11, 12, and 25, 2008, the Endicotts allowed Scott to enter their Madison County residence and batter Joseph. He further alleged that on those dates the Endicotts knew or reasonably should have known that Scott was alone with Joseph in their Madison County residence and knew or reasonably should have known that he had battered Joseph. The plaintiff alleged that based upon reasonable information and belief, on January 21, 2009, the Endicotts allowed Scott to enter their Clinton County residence while Joseph was at the house and batter Joseph. He alleged that based upon reasonable information and belief, the Endicotts were

present when Scott entered the home, they knew or reasonably should have known he was alone with Joseph, they knew or reasonably should have known he battered Joseph, and they were present at the home when Joseph was battered. The plaintiff contends that by allowing Scott to batter Joseph, the Endicotts failed to exercise reasonable care to secure the safety of Joseph and were negligent in performing the duty they undertook to protect Joseph and keep him safe. He alleged that as a direct and proximate result of their negligent performance of the duty they voluntarily undertook to protect Joseph and keep him safe, he suffered injuries which caused him great pain and suffering and ultimately caused his death.

¶ 18    The plaintiff brought a claim against McEwen, individually, under 42 U.S.C. § 1983 (2006), for the deprivation of substantial due process rights under a special relationship theory. He alleged that McEwen was the director of the Department at all relevant times and was being sued in his individual capacity. The plaintiff alleged that on or about September 25, 2008, a child investigator from the Department acting at the direction of McEwen and under color of state law took Joseph into the Department's custody after observing injuries Joseph had sustained and interviewing Joseph's daycare provider at Karen Levy Daycare. Once Joseph was taken into the custody of the agency, McEwen entered into a special relationship with Joseph. This relationship gave rise to a duty on the part of McEwen to protect Joseph. On or about October 7, 2008, attorneys for the agency, acting at McEwen's direction, agreed to allow Joseph to be returned to the custody of Valerie. Joseph was ultimately killed by Scott while in Valerie's custody. The plaintiff alleged that McEwen violated Joseph's due process right under the fourteenth amendment to the United States Constitution to personal security and safety when he, acting under color of state law, did not exercise *bona fide* professional judgment by allowing Joseph to be placed back in Valerie's custody, did not exercise *bona fide* professional judgment by continuing to allow Joseph to remain in Valerie's custody when he knew that Valerie made Joseph live with Scott even though a no-contact order had been entered to protect Joseph from Scott, and did not exercise *bona fide* professional judgment by continuing to allow Joseph to remain in Valerie's custody when he knew that Scott was battering Joseph during the time Valerie made Joseph live with Scott.

¶ 19    The plaintiff also brought a count against McEwen alleging the deprivation of substantive due process rights under 42 U.S.C. § 1983 (2006) under a state-created danger theory. He alleged that Joseph had a substantive due process right under the fourteenth amendment to the United States Constitution in his own personal security and safety. He alleged that on or about November 25, 2008, an investigator and an intact family worker from the agency, acting at McEwen's direction and under color of state law, instituted a safety plan which took custody of Joseph away from Valerie and placed Joseph in the custody of the Endicotts. He alleged that when the plan was instituted McEwen knew that the Endicotts were going to have Scott at their home for a holiday meal. He asserted that it was also known by McEwen, the investigator, and the intact family worker from the Department that the court had entered a no-contact order against Scott for Joseph's protection. The plaintiff argues that McEwen violated Joseph's due process rights under the fourteenth amendment to the United States Constitution to personal security and safety when the investigator and the intact family worker from the Department, acting under McEwen's direction and under color of state law,

affirmatively placed Joseph in a position of danger he would not otherwise have faced by placing him in the custody of the Endicotts when it was known that the court had entered a no-contact order for Joseph's protection from Scott and that Scott would be present in the Endicotts' home while Joseph was in their custody.

¶ 20 The plaintiff sued Rawlings, individually, alleging a deprivation of a substantive due process right under 42 U.S.C. § 1983 (2006) under a special relationship theory.

¶ 21 The October 7, 2008, temporary custody order and the December 2, 2008, court order were attached to the amended complaint. In addition, a copy of the safety plan was attached to the amended complaint. The copy of the safety plan is illegible.

¶ 22 On May 5, 2011, McEwen filed a demand for a bill of particulars. He alleged that the plaintiff's "bald allegations that [he] had personal knowledge of the specific actions taken by subordinates in this case as well as the actions and intentions of persons not employed by the Department are lacking in credibility and are insufficient to place [him] on notice of any actions taken by him personally that could have subjected him to liability under 42 U.S.C. § 1983 in the manner alleged by the plaintiff's amended complaint." He requested that the plaintiff provide evidence to support the claim that he had personal knowledge of the safety plan for Joseph, that he had personal knowledge of the no-contact order entered by the circuit court, that he had personal knowledge of the Endicotts' holiday plans and that the plans would place Joseph in danger, and that he personally directed the activities of investigators and/or intact family workers employed by the Department with regard to Joseph.

¶ 23 On May 27, 2011, Rawlings filed a motion to dismiss the plaintiff's amended complaint. On June 1, 2011, the plaintiff filed an objection and motion to dismiss McEwen's demand for a bill of particulars. The plaintiff argued that nothing in his complaint was so wanting in detail that McEwen was entitled to more information regarding the allegations against him so that he may prepare a defense.

¶ 24 On June 6, 2011, the Endicotts filed a motion to dismiss pursuant to section 2-615 of the Code. They alleged that the complaint failed to properly state a cause of action. They argued that the allegations consisted of conclusions of the pleader and attempted to impose duties upon them when there was no basis in law or fact to impose such duties. On June 27, 2011, the plaintiff filed a response to the Endicotts' motion to dismiss his first amended complaint. On the same day he filed a response to Rawlings' motion to dismiss his first amended complaint.

¶ 25 On June 29, 2011, the court heard argument on McEwen's demand for a bill of particulars. The plaintiff argued that he was allowed to have reasonable information and reasonable discovery and that he did not have to set forth all of his evidence in his initial pleading. He argued that he pled all the elements for a cause of action under section 1983. McEwen argued that he needed to know the basis upon which the plaintiff claimed he had personal knowledge of the danger to Joseph other than that he should have known the facts of this case because he is the director of the Department.

¶ 26 McEwen argued that the court has general jurisdiction over claims brought pursuant to section 1983, but does not have jurisdiction over official capacity suits or suits against the State of Illinois. McEwen argued that while the suit purported to be against him individually,

it was against him in his official capacity and that he enjoyed sovereign immunity. He asserted that the suit belonged in the Court of Claims. The plaintiff argued that lawsuits under section 1983 can be brought in both federal and state courts and that the case did not have to be brought in the Court of Claims. The plaintiff argued that this was not an official capacity suit. He argued that it was an action for failing to exercise *bona fide* professional judgment, which is actionable under section 1983.

¶ 27    The court entered an order finding that the plaintiff did not have a sufficient factual basis for the complaint against McEwen and *sua sponte* ordered that the complaint against him be dismissed. It further held that in light of the ruling, the demand for a bill of particulars was moot.

¶ 28    On the same date, the court heard Rawlings' motion to dismiss. Rawlings argued that if the special relationship count was dismissed against McEwen, the count against her should be dismissed for the same reason. The court stated that "it might be a little different" because she was the caseworker. The court denied Rawlings' motion to dismiss.

¶ 29    The court also heard the Endicotts' motion to dismiss. The Endicotts argued that the allegations in the complaint were conclusions. They argued that just because they allowed Valerie and Joseph to stay in houses they owned did not create a special relationship between them and Joseph. They asserted that Valerie was Joseph's natural mother and had legal custody of the child. They argued that the mother-child relationship cannot be defeated by strangers. The Endicotts admitted that Joseph was vulnerable, but denied a relationship that made him dependent on them. They asserted that there was no legal basis to create a special relationship and that the plaintiff's allegations were just conclusions.

¶ 30    The plaintiff argued that legal custody "is absolutely not an issue with this cause of action." The plaintiff argued that the special relationship was created because the Endicotts allowed Joseph to stay in their homes in both Madison and Clinton Counties. He asserted that because of his age and experience, Joseph was vulnerable and dependent on them to allow him to stay in their home for shelter. The plaintiff argued that he alleged every element of the cause of action.

¶ 31    The Endicotts argued that there was no voluntary undertaking with respect to Joseph because they had no control over the child. The Endicotts argued that there was no indication that they knew of the October 7, 2008, proceeding and that they were present at the October 7 hearing. The Endicotts argued that the allegation that they knew or should have known Joseph was battered by Scott at the Madison County home was a "sheer fantasy" because there were no allegations that there was any communication between Scott and them about anything at the Madison County residence. The Endicotts argued that there was no evidence that they saw or permitted Scott to enter their residence in Clinton County on January 21, that they knew he was there, or that they spoke to him or saw him. They asserted Valerie had custody and control of Joseph and dictated what happened to him.

¶ 32    The plaintiff admitted that a voluntary undertaking is not a limitless duty and that someone is only liable to the extent of his or her voluntary undertaking. The plaintiff argued that Joseph was vulnerable and, as a three-year-old child, he was unable to protect himself. He alleged that the Endicotts allowed Joseph to stay in their homes and by doing so they then

had a duty to protect him from the outside world. He argued that he had pled all the elements of the cause of action. The court granted the Endicotts' motion to dismiss.

¶ 33    On July 29, 2011, Rawlings filed a motion to reconsider the court's ruling on her motion to dismiss the amended complaint.

¶ 34    On August 25, 2011, the plaintiff filed a motion for an Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) finding asking the court to make an express finding that there was no just reason for delaying either the enforcement or appeal, or both, of its June 29, 2011, order granting the Endicotts' motion to dismiss the plaintiff's first amended complaint and its order *sua sponte* dismissing plaintiff's first amended complaint against McEwen. The plaintiff argued that making a Supreme Court Rule 304(a) finding would allow an appeal of the judgments as to the Endicotts and McEwen, and that appellate review of the judgments would obviate the potential need for multiple trials in the case.

¶ 35    On November 23, 2011, following argument on Rawlings' motion to reconsider, the court granted her motion to dismiss with leave to file an amended complaint within 28 days. The plaintiff's attorney then asked to have his motion for a Rule 304(a) finding heard. He stated that when his claims against the Endicotts were dismissed and when the court *sua sponte* dismissed his claims against McEwen, there was no express finding that the judgment or enforceability or appeal of the decisions should be delayed. He asked for such a finding so that he could challenge the rulings in the court of appeals. The court granted the plaintiff's motion for a Supreme Court Rule 304(a) finding. It held that pursuant to Supreme Court Rule 304(a) there is no just reason for delaying either the enforcement or appeal, or both, of the court's June 29, 2011, order granting the Endicotts' motion to dismiss the plaintiff's first amended complaint and the court's June 29, 2011, order *sua sponte* dismissing the plaintiff's first amended complaint against McEwen.

¶ 36    On December 20, 2011, the plaintiff filed a notice of appeal of the June 29, 2011, order dismissing the plaintiff's claims against the Endicotts and McEwen.

¶ 37    On December 21, 2011, the plaintiff filed a second amended complaint against Scott, Valerie, the Endicotts, McEwen, and Sophia. Because Scott and Valerie are not a subject of this appeal we will not discuss the counts against them. The counts against the Endicotts and McEwen are identical to the counts in the first amended complaint. The plaintiff notes in footnotes that these counts were dismissed on June 29, 2011, and that he has filed a notice of appeal requesting appellate review of the order.

¶ 38    The plaintiff brought a count against Rawlings for the deprivation of a substantive due process right under 42 U.S.C. § 1983 (2006). The plaintiff alleged that Rawlings was being sued in her individual capacity. He alleged that on or about September 25, 2008, the Department removed Joseph from the custody of Valerie and took him into custody. By taking him into custody, the Department restrained Joseph's individual freedom to act on his own behalf. The plaintiff alleged that by taking him into custody, the Department entered into a special relationship with Joseph which gave rise to a duty on the part of the Department to keep Joseph safe. The plaintiff alleged that on October 9, 2008, Rawlings was assigned to monitor the Department's case on Joseph after he was returned to Valerie. The plaintiff alleged that as a child welfare specialist for the agency, a special relationship

between Joseph and the Department was imputed to Rawlings. The plaintiff asserted that Rawlings violated Joseph's substantive due process rights under the fourteenth amendment to the United States Constitution to personal security and safety when she, acting under color of state law, did not exercise *bona fide* professional judgment. The plaintiff alleged that Rawlings failed to exercise *bona fide* professional judgment by continuing to allow Joseph to remain in Valerie's custody when she knew that Valerie made Joseph live with Scott even though a no-contact order was entered by the court to protect Joseph from Scott, by continuing to allow Joseph to remain in Valerie's custody when she knew that Scott was battering Joseph during the period Valerie made Joseph live with Scott, and by failing to intervene to protect Joseph when she knew Scott was battering Joseph during the period Valerie made Joseph live with Scott.

¶ 39        On January 6, 2012, McEwen filed a motion to stay responsive pleadings asking that any response to the second amended complaint be stayed until a ruling was issued on the appeal taken pursuant to the Rule 304(a) order. On January 11, 2012, the Endicotts filed a motion to stay responsive pleadings. Both motions alleged that the plaintiff's second amended complaint was filed concurrent to his filing of a notice of appeal and raised identical causes of action and allegations of facts as those that were the subject of the original complaint and the first amended complaint. The defendants asked that because a ruling in their favor by the appellate court would likely resolve the issues raised in the second amended complaint, any response to the second amended complaint be stayed until a ruling on the appeal was issued.

¶ 40        On January 23, 2012, Rawlings filed a motion to dismiss the plaintiff's second amended complaint. She alleged that the court had no jurisdiction over the case because it should have been filed in the Court of Claims. Rawlings next argued that since the state did not have custody of Joseph, it did not owe him a duty to protect him from Scott, and therefore no constitutional violation of due process could exist. She asked that the court grant her motion to dismiss the plaintiff's second amended complaint against her with prejudice.

¶ 41        On February 29, 2012, the plaintiff filed a response to Rawlings' motion to dismiss his second amended complaint. He argued that he expressly stated that Rawlings was being sued in her individual capacity and that reading the complaint in its entirety indicates that she is being sued in her individual capacity. He further argued that Rawlings had a duty to protect Joseph whether or not he was in state custody when he was beaten and killed.

¶ 42        On March 2, 2012, the court heard Rawlings' motion to dismiss. The court granted Rawlings' motion to dismiss the plaintiff's second amended complaint with prejudice, finding that she had no duty to protect Joseph. The court further found that pursuant to Supreme Court Rule 304(a) there was no just reason to delay the enforcement or appeal of this order.

¶ 43        On the same day, the court granted the Endicotts' and McEwen's motion to stay their response to the plaintiff's second amended complaint. The plaintiff appealed the court's order granting Rawlings' motion to dismiss his second amended complaint.

¶ 44                                        ANALYSIS

¶ 45        "A motion to dismiss under section 2-615 challenges the legal sufficiency of the

complaint." *Gilchrist v. Snyder*, 351 Ill. App. 3d 639, 642 (2004). "Dismissal is appropriate only where, viewing the allegations in the light most favorable to the plaintiff, it is clear that no set of facts can be proved under the pleadings that will entitle the plaintiff to relief." *Id.* Documents and exhibits that have been incorporated into the pleadings may be considered by the court when ruling on a section 2-615 motion. *Taylor v. Frey*, 406 Ill. App. 3d 1112, 1115 (2011). The grant of a motion to dismiss under section 2-615 is subject to *de novo* review. *Gilchrist*, 351 Ill. App. 3d at 642.

¶ 46     Count VII and count XI of the plaintiff's first amended complaint allege that the Endicotts were guilty of negligence under the Survival Act and counts IX and XIII allege that the Endicotts were guilty of negligence under the Wrongful Death Act for breaching a voluntary custodian/protectee relationship they undertook with respect to Joseph. The plaintiff alleged that this relationship developed as a result of the Endicotts allowing Valerie and Joseph to stay at their residence in Madison County when Joseph was a child who was vulnerable and dependent on them for a place to live.

¶ 47     "In order to prevail in a negligence action, a plaintiff's complaint must set forth facts establishing the existence of a duty owed by defendant to plaintiff, a breach of that duty and an injury proximately caused by the breach." *Charleston v. Larson*, 297 Ill. App. 3d 540, 546 (1998). Whether the plaintiff and defendant had a relationship that gave rise to a duty that imposes upon the defendant the obligation of reasonable conduct for the benefit of the plaintiff is a question of law. *Id.* The legal determination of whether a duty exists is dependent upon the factual circumstances giving rise to the litigation. *Id.*

¶ 48     "Generally speaking, Illinois law does not impose a duty to protect another from a criminal attack by a third person unless the attack is reasonably foreseeable and the parties stand in one of four 'special relationships,' namely: (1) common carrier and passenger, (2) innkeeper and guest, (3) business invitor and invitee, and (4) voluntary custodian and protectee." *Hernandez v. Rapid Bus Co.*, 267 Ill. App. 3d 519, 524 (1994). In the instant case, the plaintiff alleged a voluntary custodian and protectee relationship between the Endicotts and Joseph. This theory of liability is based on section 314A(4) of the Restatement (Second) of Torts and provides that a special relationship creating a duty to aid or protect exists when one "voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection." Restatement (Second) of Torts § 314A(4) (1965). The question is whether the Endicotts voluntarily took control of Joseph.

¶ 49     In *Doe v. Big Brothers Big Sisters of America*, 359 Ill. App. 3d 684 (2005), the court examined whether or not the Big Brother Big Sisters of America organization had a special relationship with a minor who was sexually abused by his mentor from its Chicago affiliate. In determining whether a special relationship existed, the court examined whether the organization voluntarily took custody of the minor. *Id.* at 702. The court found that the organization did not voluntarily take custody of the minor because it did not have actual or constructive possession of the minor, it did not assume any of the responsibilities associated with the status of custodian, it had no ability to guard or protect the minor, it had no authority over him, and it had no manner in which to dictate any of his activities or how he was cared for. *Id.* It held that the plaintiff failed to present sufficient evidence that the organization stood in a special relationship with the minor, thus imposing a duty on it. *Id.*

-11-

¶ 50     In *Platson v. NSM, America, Inc.*, 322 Ill. App. 3d 138 (2001), the plaintiff sued NSM for negligent supervision alleging that while employed by NSM through a work-study program offered by her high school, she was physically assaulted on NSM premises by a company employee. *Id.* at 140. NSM filed a motion to dismiss pursuant to section 2-615 of the Illinois Code of Civil Procedure (735 ILCS 5/2-615 (West 1998)), and the circuit court granted it. *Platson*, 322 Ill. App. 3d at 140. The appellate court found that the plaintiff stated a cause of action based on the "special relationship" doctrine. *Id.* at 146. The court found "[w]hat it means to 'take custody of another' or 'deprive another of his normal opportunities for protection' is not made obvious by the language of section 314A(4)." *Id.* The court found that the few cases in Illinois applying section 314A(4) did not elaborate on the definition of the " 'voluntary custodian/protectee' " relationship. *Id.* at 147. The court looked to other jurisdictions and found *Slagle v. White Castle Systems, Inc.*, 607 N.E.2d 45 (Ohio Ct. App. 1992), helpful. *Platson*, 322 Ill. App. 3d at 147. That court "observed that to assume custody of a child is to stand '*in loco parentis* to the child, accepting all the rights and responsibilities that go with that status.' " *Id.* at 147 (quoting *Slagle*, 607 N.E.2d at 49). The court found that by participating in the work-study program NSM assumed the delicate charge of mentoring a student in the world of work. *Id.* at 148. The court determined that a work-study student is vulnerable because of age and inexperience. *Id.* It further found that NSM had the power that any employer possesses over its employee plus the added power to affect the plaintiff's academic standing through its evaluation of her work performance. *Id.* The court inferred that the disparity in power between NSM and the student-employee may have disinclined her from protesting or attempting to avoid working with the individual who physically assaulted her. *Id.* at 148-49. The court held that given the nature of the plaintiff's work situation, she adequately alleged that NSM took custody of her as defined by section 314A(4) and did not leave her avenues of self-protection. *Id.* at 149.

¶ 51     The Endicotts cite *Sunnarborg v. Howard*, 581 N.W.2d 397 (Minn. Ct. App. 1998), a Minnesota case, in support of their argument that no special relationship existed between them and Joseph. In that case a guardian *ad litem* brought an action on behalf of a minor alleging that Robert Howard had committed sexual battery against the minor and that Donald Howard had negligently failed to protect the minor from the sexual battery. *Id.* at 398. The minor, Donald's niece, began staying with him during the week because her mother had failed to ensure her regular attendance at school. *Id.* When the minor stayed with him, he provided meals and discipline, and made sure she got on the school bus, did her homework, and went to bed at an appropriate time. *Id.* At some point Donald's brother and the minor's father, Robert, began living at the house. *Id.* Robert was charged with committing criminal sexual conduct against the minor, and some of the abuse occurred in Donald's home. *Id.* The court examined whether the district court erred in concluding that no special relationship existed between Donald and the minor and, therefore, that Donald did not have a duty to protect her from sexual abuse by Robert. *Id.*

¶ 52     The court found that generally when a parent is present, the parent is responsible for the child's care and safety, and a third party does not stand in a special relationship to the child. *Id.* at 399. A parent may impose the responsibility of supervision of his or her minor child on a third party only when the third party accepts the responsibility. *Id.* The court found that

there was no evidence that Robert's parental rights had been legally restricted or terminated. *Id*. The court held that once Robert began living in Donald's home, Donald was in the position of social host. *Id.* The court found that although there was evidence that Donald continued to help care for the minor after Robert moved into the house, there was no evidence that Robert had imposed any responsibility for protecting the minor on Donald or that Donald had agreed to accept any such responsibility from Robert. *Id.* The court held that when Robert was present, no special relationship existed between Donald and the minor, so Donald could not be held liable for Robert's sexual abuse of the minor. *Id.*

¶ 53    The plaintiff cites a Minnesota case, *Donaldson v. Young Women's Christian Ass'n of Duluth*, 539 N.W.2d 789 (Minn. 1995), in support of his argument that a special relationship existed between the Endicotts and Joseph. While the case was decided against the *Donaldson* plaintiff, the plaintiff in the instant case found the court's definition of what must exist to establish a voluntary custodian/protectee relationship applicable. In *Donaldson*, the appeal arose out of a wrongful death action brought by the heirs of Lynette Robarge against the Young Women's Christian Association of Duluth (Association) as a result of her suicide. *Id.* at 790. Robarge lived at a housing facility owned and operated by the Association. *Id.* at 790-91. The plaintiff alleged that the Association negligently failed to respond when other residents reported that Robarge was in distress in her room and needed assistance. *Id.* at 790. The Association argued that it had no duty to protect Robarge from committing suicide. *Id.* The district court granted the Association's motion for summary judgment, finding that there was no special relationship. The court of appeals reversed, finding that a special relationship did exist. *Id.*

¶ 54    On appeal to the Supreme Court of Minnesota, the plaintiff argued that a special relationship existed between the parties analogous to an innkeeper-guest relationship. *Id.* at 792. The Supreme Court of Minnesota found, however, that for a special relationship to exist, typically the plaintiff must be in some respect particularly vulnerable and dependent on the defendant, who in turn holds considerable power over the plaintiff's welfare. *Id.* It further found that the harm to be prevented by the defendant must be one that the defendant is in a position to protect against and should be expected to protect against. *Id.* The court held that the Association was not in a position to protect Robarge from committing suicide, and that she had no reasonable expectation that it would do so. *Id.* at 793. It found that the Association did nothing to deprive Robarge of her normal opportunities for self-protection. *Id.* The court held that the relationship between the Association and Robarge lacked the degree of dependence and control necessary to form a special relationship which created a duty on the Association's part to prevent Robarge's suicide. *Id.*

¶ 55    In the counts against the Endicotts alleging a breach of a voluntary custodian/protectee relationship, the plaintiff alleged that Joseph was only three years old when he lived at the Endicotts' residences in Madison and Clinton Counties and that due to his age he could not make his own living arrangements. The plaintiff argues that the Endicotts had power over Joseph's welfare because he depended on them for a place to live. He argues that if the high school student in *Platson* was considered vulnerable, a three-year-old Joseph would certainly be considered vulnerable. The plaintiff further argues that if the power to affect a student's academic standing is enough to establish a voluntary custodian/protectee relationship, then

the power to end someone's residency at any time supports the existence of such a relationship. We disagree.

¶ 56    "Parents have legal custody of their children by virtue of their status as biological parents, and that status can only be relinquished through court order." *In re A.W.J.*, 316 Ill. App. 3d 91, 99 (2000). Valerie had physical and legal custody of Joseph at all relevant times except the period of September 25, 2008, to October 7, 2008, at which time Joseph was in the temporary custody of the Department. In the facts common to all counts, the plaintiff alleged that on November 23, 2008, a child protection investigator instituted a safety plan that placed Joseph in the Endicotts' custody. The record contains copies of the safety plan, but they are illegible. There is no way to ascertain whether custody of Joseph was taken from Valerie and given to the Endicotts. The appellant has the burden of providing the reviewing court with a sufficiently complete record, and if he or she fails to do so, the reviewing court will resolve any doubts that arise from an incomplete record against the appellant and will presume that the trial court's order was in conformity with the law and had a sufficient factual basis. *McCarty v. Weatherford*, 362 Ill. App. 3d 308, 317 (2005). On October 7, 2008, the court awarded temporary custody of Joseph to Valerie. On December 2, 2008, the court entered an order stating that the case remained "status quo." There are no court orders in the file that indicate that Joseph was ever placed in the custody of the Endicotts. The only court orders indicate that from October 7, 2008, through the date of Joseph's death, he was in Valerie's custody. The parties agree that at the time of Joseph's fatal beating, he was in the custody of his mother. Aside from the allegation about the safety plan, there are no allegations that the Endicotts had actual or constructive possession of Joseph, that they assumed any of the responsibilities associated with the status of custodian, that they had authority over him, or that they were able to dictate his activities or the details of his care.

¶ 57    This case is similar to the *Sunnarborg* case. In both cases, the abused minor was living with a parent in the home of nonparents. In *Sunnarborg*, the court held that even when the nonparent helps care for the minor, if there is no evidence that the parent imposed any responsibility for protecting the minor on the nonparent and no evidence that the nonparent accepted any such responsibility, no special relationship exists between the minor and the nonparent that would subject him or her to liability for another's abuse of the minor. *Sunnarborg*, 581 N.W.2d at 399. In the instant case, there are no allegations that the Endicotts helped care for Joseph, that Valerie asked the Endicotts to supervise Joseph at any time, or that the Endicotts accepted such responsibility. Thus, Valerie was responsible for Joseph's care and safety, and the Endicotts did not stand in a special relationship to the child.

¶ 58    This case differs from *Platson* because in that case when the minor was physically assaulted on NSM premises by a company employee, her parent was not present and she was under the control of NSM. Further, this control did not leave the minor with avenues for self-protection. While the minor was at work, NSM assumed the rights and responsibilities for her safety. This was not true in the instant case. Valerie had custody of Joseph. While the Endicotts allowed Valerie and by extension Joseph to stay in their Madison County home, they did not reside there and had no physical or constructive control over him. While they allowed Valerie and Joseph to stay in their Clinton County home where they resided, they still did not exercise any control over the child. There are no allegations that Valerie

-14-

entrusted the care of Joseph to the Endicotts. The Endicotts did not assume the rights and responsibilities for Joseph's safety, and allowing Valerie and Joseph to live in their residences did not deprive him of his normal opportunities for self-protection. The plaintiff failed to plead facts sufficient to establish a voluntary custodian and protectee relationship between the Endicotts and Joseph. As a result, the court properly dismissed counts VII, IX, XI, and XIII.

¶ 59　　Counts VIII, X, XII, and XIV alleged a negligent breach of a voluntary undertaking by the Endicotts under the Survival Act and the Wrongful Death Act. The counts allege that by allowing Valerie and Joseph to stay at their residences in Madison and Clinton Counties, the Endicotts took charge of Joseph and voluntarily undertook a duty to protect and keep him safe.

¶ 60　　Illinois courts look to sections 323 through 324A of the Restatement (Second) of Torts in defining the parameters of the voluntary undertaking theory of liability. *Bell v. Hutsell*, 2011 IL 110724, ¶ 12. The plaintiff premises the Endicotts' liability on section 324 of the Restatement, which provides as follows:

> "One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
>
> (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
>
> (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him." Restatement (Second) of Torts § 324 (1965).

¶ 61　　The plaintiff argues that the instant case is similar to *Wakulich v. Mraz*, 203 Ill. 2d 223 (2003). In *Wakulich* the plaintiff was the mother of a 16-year-old girl who died after drinking at the defendants' home. *Id.* at 227. The plaintiff alleged that after her daughter was goaded into drinking a quart bottle of Goldschlager by the defendants, she lost consciousness. *Id.* at 226-27. The defendants placed her in the family, room where they observed her " 'vomiting profusely and making gurgling sounds.' " *Id.* at 227. They removed her vomit-saturated blouse and placed a pillow under her head to prevent aspiration. *Id.* The defendants allegedly refused to drive the girl home, did not contact her parents, did not seek medical attention, and prevented others from calling 911 or seeking medical intervention. *Id.* The next morning one of the defendants ordered the other defendants to remove the girl from their home, which they did. *Id.* The girl died later that day. *Id.* The plaintiff alleged that the defendants were negligent in failing to act reasonably to protect the girl after voluntarily undertaking to care for her after she lost consciousness. *Id.* The defendants moved to dismiss the complaint pursuant to section 2-615 of the Code for failure to state a cause of action. *Id.* The trial court dismissed the complaint with prejudice. *Id.* The plaintiff appealed, and the appellate court reversed. *Id.* at 227-28.

¶ 62　　The supreme court reaffirmed the appellate court, finding that the allegations of the plaintiff's complaint sufficiently stated a cause of action based on a voluntary undertaking theory. *Id.* at 246. It found that the defendants did more than make a floor available for the

girl to "sleep it off"; they took complete and exclusive charge of her care after she became unconscious. *Id.* at 243. They placed her in the family room, checked on her periodically, took measures to prevent aspiration, removed her soiled blouse, and prevented other people from intervening on her behalf. *Id.* The plaintiff alleged that the defendants failed to summon aid by contacting the girl's parents, failed to obtain medical assistance, and prevented others from obtaining aid, proximately causing her death. *Id.* at 245. The court found that the allegations, liberally construed, sufficiently alleged that the defendants' conduct increased the risk of harm to the girl. *Id.*

¶ 63    The plaintiff argues that like the plaintiff in *Wakulich*, Joseph was helpless to adequately protect himself. He asserts that because Joseph was only three years old when he resided in the Endicotts' Madison and Clinton County residences, he could not adequately protect himself against dangers. He asserts that by allowing Joseph to reside at their residences, the Endicotts rendered assistance. The plaintiff argues that the sole difference between this case and *Wakulich* is that while Joseph lived at the Endicotts' residence in Madison County and was living at their residence in Clinton County at the time of his death, the girl in *Wakulich* only stayed at the defendants' home one night. The plaintiff argues that if the supreme court is satisfied with allowing a cause of action against defendants when a helpless girl was in their home for only one night, it follows that a cause of action can be maintained against the Endicotts, with whom a helpless child was living. This argument ignores that the court in *Wakulich* specifically found that the defendants did more than allow the girl to stay in their home for one night, but rather took complete and exclusive charge of the minor's care, failed to summon aid, and prevented others from assisting her. *Wakulich*, 203 Ill. 2d at 243-45.

¶ 64    "Under a voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Bell*, 2011 IL 110724, ¶ 12. The voluntary undertaking theory is narrowly construed. *Id.* The plaintiff alleged that the Endicotts took charge of Joseph by permitting him to stay in their residences in Madison and Clinton Counties and voluntarily undertook a duty to protect Joseph and keep him safe. He further alleged that the Endicotts allowed Scott to enter their homes on various dates knowing that there was a no-contact order prohibiting Scott from having contact with Joseph. There are no allegations that the Endicotts provided shelter to Valerie and Joseph in order to help protect the child from Scott. Valerie had custody and control over Joseph. As the mother and custodian of Joseph, it was Valerie's job to protect Joseph and make sure there was no contact between him and Scott. The plaintiff does not assert that the Endicotts looked after Joseph, that they cared for him in any way, or that they made any decisions regarding his care and safety. The Endicotts did not have complete or exclusive charge over Joseph. There is nothing to indicate that by allowing Valerie and Joseph to reside in their homes the Endicotts voluntarily undertook to do anything more. They simply allowed Joseph to reside in their home under the care of his mother. As such, there is no evidence indicating a voluntary undertaking to protect Joseph. The plaintiff failed to allege facts sufficient to establish a voluntary undertaking on the part of the Endicotts to protect Joseph from foreseeable attacks by third parties. As such, he failed to state a cause of action based on a voluntary undertaking theory, and counts VIII, X, XII, and XIV were properly dismissed.

¶ 65    The plaintiff next argues that the circuit court erred in *sua sponte* dismissing with

prejudice the counts in the first amended complaint against McEwen. A cause of action which has been terminated *sua sponte* by the court is subject to *de novo* review of the legal sufficiency of the complaint. *People v. Vincent*, 226 Ill. 2d 1, 13 (2007).

¶ 66   Because the plaintiff has similar counts against McEwen and Rawlings for violating Joseph's due process right to personal security and safety under the fourteenth amendment to the United States Constitution, we will address these counts together. The plaintiff argues that he is suing McEwen and Rawlings in their individual capacities under 42 U.S.C. § 1983 (2006).

¶ 67   While the due process clause of the fourteenth amendment generally does not impose upon the state a duty to protect individuals from harm by private actors, there are two exceptions. *King v. East St. Louis School District 189*, 496 F.3d 812, 817 (7th Cir. 2007). The first exception is that the Constitution imposes a duty upon the state to protect individuals with whom it has a "special relationship" by virtue of the state's custody over the individual. *Id.* Courts have also inferred that the substantive component of the due process clause imposes upon the state a duty to protect individuals against dangers the state itself creates under the state-created danger doctrine. *Id.* The plaintiff first argues that the special relationship exception applies to impose a duty on McEwen and Rawlings.

¶ 68   In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the United States Supreme Court set parameters on when the state has a duty to protect individuals from harm by private actors. The petitioner was a boy who was beaten and permanently injured by his father, with whom he lived. *Id.* at 191. The respondents were social workers and other local officials who received complaints that the child was being abused by his father and had reason to believe that this was the case, but nonetheless did not act to remove him from his father's care. *Id.* The boy's father was tried and convicted of child abuse. *Id.* at 193. The boy and his mother brought the action under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Wisconsin against the respondents alleging that the respondents deprived the boy of his liberty without due process of law, in violation of his rights under the due process clause of the fourteenth amendment to the United States Constitution, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known. *Id.* at 193. The district court granted summary judgment for the respondents. *Id.* The court of appeals affirmed. *Id.*

¶ 69   The United States Supreme Court found that the due process clause forbids the state itself from depriving individuals of life, liberty, or property without "due process of law," but its language cannot be fairly extended to impose an affirmative obligation on the state to ensure that those interests do not come to harm through the actions of private actors. *Id.* at 195. The Court held that the purpose of the due process clause was to protect people from the state, not to ensure that the state protected them from each other. *Id.* at 196. The Court found that the due process clause generally confers no affirmative right to governmental aid, even when such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. *Id.* The Court held that a state's failure to protect an individual against private violence does not constitute a due process clause violation. *Id.* at 197.

¶ 70    The petitioners argued that even if the due process clause imposed no affirmative obligation on the state to provide the general public with adequate protective services, such a duty arose out of a special relationship assumed by the state with respect to the minor boy because the state knew the boy faced a danger of abuse by his father, and the state, by word and deed, proclaimed an intention to protect him against that danger. *Id.* The petitioners asserted that having undertaken to protect the boy from his father's abuse, the state acquired an affirmative duty, enforceable through the due process clause, to do so in a reasonably competent fashion and that its failure to discharge the duty was an abuse of governmental power that so shocks the conscience as to constitute a substantive due process violation. *Id.* The Court found that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraint of personal liberty–which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200. The Court went on to state that the fact that the state once took temporary custody of the boy does not alter the analysis because when it returned him to his father's custody, it placed him in no worse a position than that in which he would have been placed had the state not acted at all. *Id.* at 201. The Court held that "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Id.* The Court held that because the state had no constitutional duty to protect the boy against his father's violence, its failure to do so did not constitute a violation of the due process clause. *Id.* at 202.

¶ 71    The plaintiff argues that the special relationship exception to the rule that the due process clause does not impose a duty on the state to protect individuals from harm by third parties applies in this case. He asserts that McEwen and Rawlings had a duty to protect Joseph because, having taken Joseph into custody, the Department owed him a rudimentary duty of safekeeping and that this duty was imputed to McEwen as the Department director and Rawlings as a Department employee. The plaintiff further argues that by having knowledge that Scott battered Joseph, they owed Joseph a duty to protect him.

¶ 72    The plaintiff cites *K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990), in support of his argument. He quotes *K.H. v. Morgan* for the following proposition:

> "If the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department. The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved." *K.H.*, 914 F.2d at 849.

The plaintiff argues that it logically follows that McEwen and Rawlings cannot rescue Joseph from an abusive household, allow him to be subjected to further abuse when placed back in the same household, rescue the child again from the same household, place him into a situation of danger he otherwise would not have faced by placing him with the Endicotts even though they knew Scott would be present at the Endicotts' residence, have knowledge that Joseph is continuing to be abused, ultimately allow Scott to batter Joseph to the point that he dies from the injuries, and then defend on the grounds that since Joseph was not in the state's custody, there was no duty on the part of the state, McEwen, or Rawlings to

-18-

protect Joseph.

¶ 73    *K.H. v. Morgan* is distinguishable from the instant case. In *K.H.* the minor girl was removed from the custody of her parents by the Department of Children and Family Services when she was discovered to have gonorrhea contracted through vaginal intercourse at age 17 months. *K.H.*, 914 F.2d at 848. The child was placed with four foster families before being returned to her natural parents. *Id.* Three months later she was removed from her parents' custody on grounds of parental neglect. *Id.* She was placed with three more foster families where she was subjected to physical and sexual abuse. *Id.* After this abuse came to light the little girl was transferred to an institution. *Id.* The minor child was not yet six years old and had changed homes nine times in four years. *Id.* K.H., through her next friend and guardian *ad litem*, brought suit against the director of the Department, the Department's guardianship administrator, and two social workers employed by the Department seeking damages to help defray the cost of the psychiatric care she needed. *Id.* at 848-49. The court held that the state, having removed the child from the custody of her parents, could not place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the fourteenth amendment. *Id.* at 849.

¶ 74    The court specifically distinguished the facts before it from those before the *DeShaney* Court, stating "[t]his is not a 'positive liberties' case, like *DeShaney*, where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state." *Id.* at 848-49. The court found that the only question in the case was the right of a child *in state custody* not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser. *Id.* at 852. The court rejected the defense of immunity "with respect to the exceedingly narrow formulation of the right to safe foster care that we have sketched." *Id.* at 853.

¶ 75    In the instant case, *K.H.* does not apply because Joseph was not in state custody when Scott abused him. This case is analogous to *DeShaney*. As in *DeShaney*, Joseph was temporarily in the custody of the Department and was then returned to his parent's custody. At the time he was battered by Scott in November 2008, and eventually killed due to battering by Scott in January 2009, Joseph was still in Valerie's custody and was not in the custody of the Department. Because Joseph was not deprived of his liberty, the protections of the due process clause were not triggered. As a result, McEwen and Rawlings did not have a constitutional duty to protect Joseph from abuse by Scott, and their failure to do so did not constitute a violation of the fourteenth amendment. The circuit court properly dismissed the counts against McEwen and Rawlings alleging a constitutional duty because of a special relationship with Joseph.

¶ 76    The plaintiff next argues that McEwen violated Joseph's substantive due process right under the fourteenth amendment when the Department investigator and intact family worker, acting at McEwen's direction, placed Joseph in a position of danger he would not otherwise have faced by placing him in the custody of the Endicotts when it was known that the circuit court had entered a no-contact order for Joseph's protection from Scott and Scott would be present in the Endicotts' residence while Joseph was in their custody. The plaintiff alleges that this took place on November 25, 2008, when an investigator and intact family worker

from the Department, acting at the discretion of McEwen and under color of state law, instituted a safety plan which took custody of Joseph away from Valerie and placed Joseph in the custody of the Endicotts. As discussed, the record contains illegible copies of the safety plan. There are no court orders in the file that indicate that Joseph was ever placed in the custody of the Endicotts. The only court orders indicate that from October 7, 2008, through the date of Joseph's death, he was in Valerie's custody. The parties agree that at the time that Joseph was beaten by Scott and the beating resulted in his death, Joseph was in his mother's custody.

¶ 77       In determining whether to employ the state-created danger theory, the plaintiff must plead facts showing an affirmative act on the state's part that either created the danger or rendered him more vulnerable to an existing danger. *Lewis E. v. Spagnolo*, 186 Ill. 2d 198, 220 (1999). "Mere inaction by state actors, even in the face of a known danger, is not sufficient to trigger an affirmative duty on the part of the state under this theory." *Id.* "The state must therefore affirmatively put private individuals in harm's way, effectively throwing them 'into a snake pit.' " *Brown v. Reyes*, 815 F. Supp. 2d 1018, 1022 (N.D. Ill. 2011). The court must examine what actions the state affirmatively took and what danger the victim would have otherwise faced. *Id.* "In other words, affirmatively creating a dangerous situation will trigger a constitutional duty to protect, but negligently failing to react to a potentially dangerous situation or sitting idly by does not." *Id.* at 1023.

¶ 78       In the instant case, McEwen did not take any affirmative action that created the danger to Joseph or that increased the danger to him. Prior to the Department taking temporary custody of Joseph, he was in his mother's custody, and she allowed him to be beaten by her paramour Scott. Joseph was returned to his mother's custody and was in her custody at the time of his beatings at issue in this case. Joseph faced the same danger he would have faced absent Department action, and he was in no worse of a position than he would have been in had the Department not taken any action at all. The plaintiff's complaint does not sufficiently allege facts that fall within the state-created danger exception to the rule that the state has no affirmative duty to protect the life, liberty, and property of its citizens from the actions of private citizens. While the actions of the Department might have been short-sighted and flawed, they do not satisfy the standard for finding a constitutional violation. The circuit court properly dismissed the count against McEwen alleging a due process violation due to a state-created danger.

¶ 79       The Endicotts did not have a special relationship with Joseph because at all relevant times he was under the control and custody of his mother. There were no allegations that Valerie entrusted the care of Joseph to the Endicotts, that the Endicotts assumed the rights and responsibilities for Joseph's safety, or that by allowing Joseph to reside in their homes the Endicotts deprived him of his normal opportunities for self-protection. The Endicotts voluntarily allowed Joseph to reside in their homes while in the custody of his mother. There are no allegations showing that the Endicotts voluntarily undertook any additional duty to Joseph. Because the plaintiff failed to plead facts sufficient to establish a voluntary custodian and protectee relationship between the Endicotts and Joseph or that the Endicotts voluntarily undertook a duty to protect Joseph, the circuit court properly dismissed the counts against the Endicotts. Joseph did not have a constitutional right to be protected from actions by

-20-

private actors because he was not in the custody of the state, but was in the custody of his mother, and the state neither created the danger nor made him more vulnerable to it. Thus, the circuit court properly dismissed the counts against McEwen and Rawlings.

¶ 80                                                    CONCLUSION

¶ 81        For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

¶ 82        Affirmed.